**TRUE NORTH COMPOSITES, LLC, Plaintiff,**

v.

**TRINITY INDUSTRIES, INC. Defendant.**

**No. CIV.A.99–783–RRM.**

United States District Court, D. Delaware.

March 5, 2002.

As Amended April 18, 2002.

486

Allen M. Terrell, Esquire, Peter B. Ladig, Esquire and Dominick T. Gattuso, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Timothy P. Ryan, Esquire and Paul D. Steinman, Esquire, Eckert Seamans Cherin & Mellott, LC, Pittsburgh, Pennsylvania; counsel for plaintiff.

Edmond D. Johnson, Esquire, The Bayard Firm, Wilmington, Delaware; Larry D. Carlson, Esquire and K. Alan Parry, Esquire, Baker Botts L.L.P., Dallas, Texas; counsel for defendant.

## OPINION

MCKELVIE, District Judge.

This is a contract case. Plaintiff True North Composites, LLC is a Delaware limited liability company now in a dissolution trust. It formerly had its principal place of business in New Castle, Delaware. True North was the licensee of certain patents and other intellectual property relating to a process for manufacturing composite materials known as SCRIMP. Defendant Trinity Industries, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. Among its various businesses, Trinity manufactures and sells railway cars.

True North's complaint, filed November 12, 1999, contains federal patent and antitrust claims, together with state law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and economic duress. The breach of contract and good faith and fair dealing claims arise from an agreement between True North and Trinity, known as the Carbodies Supply Agreement (CSA), to jointly manufacture composite railcars.

On December 16, 1999, Trinity filed its answer and asserted counterclaims for breach of contract, breach of warranty of good faith and fair dealing, and seeking a declaratory judgment of contractual rights.

Several of True North's claims were addressed prior to trial. In an opinion dated July 5, 2000, the court found that economic duress was not a cognizable claim for damages under Delaware law. On the eve of

trial, the parties resolved True North's patent claim and True North withdrew its antitrust claim. Though no federal claims remained in the case, the parties jointly requested the court to exercise jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.[1] The court agreed.

On May 2, 2001, the parties began a nine day jury trial on the breach of contract and good faith and fair dealing claims. On May 14, 2001, the jury returned a verdict in favor of True North, finding Trinity had breached the CSA and its implied duty of good faith and fair dealing. The jury awarded damages to True North in the amount of $14,823,817.29.

Following trial, on May 29, 2001 True North moved for judgment on its remaining requests for declaratory relief. On May 30, 2001, Trinity renewed its motion, made during trial, for judgment as a matter of law. Trinity also moved for a new trial, to alter or amend the judgment, or both. Trinity's motion for a new trial argues that the jury's findings on liability and damages were against the great weight of the evidence and that the damages the jury awarded were excessive and unjust. Trinity contends a new trial is also required because the court erroneously admitted evidence of the business dealings of the parties prior to the CSA and then erroneously instructed the jury on parol evidence. Finally, Trinity also contends that the court gave erroneous instructions on the duty of good faith and fair dealing, consequential damages, and certain types of damages available under the CSA, including "Learning Curve Costs" and "Tooling and Equipment Costs."

In Trinity's motion for judgment as a matter of law and to amend the judgment, it argues True North is not entitled, as a matter of law, to several of the categories of damages awarded by the jury. It argues that the CSA is a contract for goods and therefore, under the Uniform Commercial Code, the jury cannot award damages for the reduction in True North's business value or costs to close its New Castle facility. Trinity also submits that many of True North's damages are too speculative for a jury to award, that True North cannot receive a separate recover for the breach of good faith and fair dealing, and that, as a matter of contract law, True North is not entitled to certain contractual damages for "Tooling and Equipment Costs" and "Learning Curve Costs." Thus, even presuming the jury's verdict was correct, Trinity argues that True North is not entitled to damages as a matter of law.

This is the court's decision on the parties' post-trial motions.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Background

True North began as a joint venture of E.I. DuPont de Nemours ("DuPont") and Hardcore Composites, LLC ("Hardcore") in 1994. The joint venture, known as Hardcore DuPont Composites, LLC ("HDC"), licensed from an intellectual property holding company, TPI Technologies, Inc., the right to use a patented manufacturing technique known as the Seemann Composite Resin Infusion Molding Process, or SCRIMP. SCRIMP is resin molding process that uses vacuum

---

1. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1505 (3d Cir.1996) ("Once a court has decided to exercise jurisdiction over the state claim, however, elimination of the federal claim does not deprive the court of the constitutional power to adjudicate the pendent claim.").

bag technology to create composite materials.

On July 1, 1994, HDC and Trinity entered the Preferred Supplier Agreement, by which both parties agreed to co-develop products for the railroad industry using the SCRIMP process. Both HDC and Trinity wanted to create insulated and refrigerated railcars from composites because they believed such railcars would improve upon traditional steel railcars in many respects. Both companies believed composite railcars would weigh less per cubic foot, be easier to maintain, corrode less, limit air and water leakage, and possess better thermodynamic properties for freight than steel railcars. Pursuant to the Preferred Supplier Agreement, HDC manufactured two prototype insulated composite railcars that Trinity eventually sold. The two companies then manufactured approximately 50 composite refrigerated railcars, known as first generation, or Gen I, railcars. The Gen I railcars were manufactured using a unibody construction process, which both HDC and Trinity recognized following their manufacture to be commercially impracticable. The Gen I railcars were ultimately leased by Trinity to Union Pacific Railroad.

In early 1998, HDC and Trinity began negotiating an agreement to develop and build a second generation of composite railcars, known as Gen II, that used a panel construction process rather than the unibody construction. The two companies created a Joint Panelization Team of engineers from both companies to develop preliminary specifications for a Gen II railcar.

On May 18, 1998, an investment company called True North Partners purchased DuPont's interest in HDC and changed its name to True North Composites, LLC ("True North").

On December 22, 1998, True North and Trinity entered into an agreement to co-develop and produce the Gen II railcars.

That agreement, known as the Carbodies Supply Agreement ("CSA"), is the subject of this suit. The CSA requires True North to produce composite carbodies, the box-like structures of railcars. Trinity would then separately manufacture steel undercarriages, with wheels and a platform, at a site adjacent to True North's New Castle facility, and True North would mount its carbodies to the undercarriages to create completed railcars. Following assembly, Trinity was responsible for selling the railcars in the market.

The CSA provided for the parties to build 2,000 railcars in this fashion, although the CSA specified that Trinity's "initial order" was only to be for 500 railcars. Appended to the CSA was a set of Preliminary Specifications created by the Joint Panelization Team. The Preliminary Specifications contained details for several different sizes and lengths of railcars. Of these, the CSA called for the initial order of 500 railcars to be 68–foot long Plate F railcars.

The CSA also set forth the price Trinity would pay for the carbody construction and mounting. There were set prices for the first 500 carbodies; $84,569 per carbody for the first 270 and $80,369 for the next 230. These prices were set by taking True North's estimated costs of production and adding a 10% profit. True North's prices for the next 1,500 carbodies was to be set based on this same formula, with an additional payment by Trinity of $3,647. The CSA also provided that if Trinity's composite railcar sales showed a profit in excess of 13%, True North and Trinity would evenly divide those excess profits.

Because the Preliminary Specifications appended to the CSA were not finalized, the CSA provided for amendments to the specification by the parties. To the extent Trinity proposed modifications for its customers that would slow production or have

an adverse financial impact on True North, the two parties were required to negotiate amendments in good faith. True North's proposed modifications were to be approved by Trinity, but such approval was not to be unreasonably withheld.

The CSA provided it was to be governed by Delaware law.

## B. *The Parties' Pleadings*

True North alleges that Trinity breached the CSA and the covenant of good faith and fair dealing while the two co-developed the second generation composite railcars. According to True North, Trinity engaged in a pattern of practices prior to executing the CSA to weaken True North's bargaining position; including requiring the replacement of HDC's president, George Tunis, requiring True North to divest all businesses unrelated to railcar development, and requiring True North to seek additional capital. Following the execution of the CSA, the parties experienced a number of cost overruns in developing and producing the carbodies. Significant among those cost overruns was a dispute over the criteria for the carbodies' secondary floor, a movable floor on which cargo rests and permits air to circulate between the carbody's primary floor and the cargo. True North alleges that Trinity breached the CSA by demanding that it meet an unreasonable static load requirement for the secondary floor and refusing to adjust the purchase price to account for this change.

True North also alleges that Trinity breached the CSA on June 15, 1999 by informing True North that there was no commercial interest in the initial order of 500 68–foot railcars. According to True North, Trinity informed True North to mitigate damages by stopping development of the 68–foot railcar and beginning development of a 72–foot railcar. According to the complaint, on June 29, 1999

Trinity reversed course and informed True North to continue developing the 68–foot railcar. True North asserts that Trinity's demand that it resume production of 68–foot railcars was conditioned on True North assuming the costs of certain modifications to the secondary floor.

Throughout the remainder of the summer of 1999, the parties could not agree on final specifications and which company would bear the costs of the secondary floor. Finally, in August 1999, True North closed its production facility for two weeks allegedly because of Trinity's failure to negotiate in good faith on final specifications for the carbodies and its failure to provide assurances to True North that it could sell the 68–foot railcars. True North alleges that Trinity breached the CSA, including the warranty of good faith and fair dealing, by refusing to negotiate in good faith on the final specifications of the carbodies, refusing to purchase carbodies on the terms required by the CSA, and ordering True North to stop production of the 68–foot carbodies.

True North also sought damages from Trinity on these same facts with a claim of economic duress. In its July 5, 2000 order, the court noted that Delaware law does not recognize economic duress as a claim for damages, but only as an equitable claim for restitution or rescission. It therefore granted Trinity's motion to dismiss that count of True North's complaint.

The final count of True North's complaint seeks a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, proclaiming that True North did not breach the CSA, stating that Trinity willfully or maliciously did so, granting True North the right of first refusal on any attempt by Trinity to manufacture insulated or refrigerated carbodies using composite plastics for the remaining duration of the CSA, and granting True

North the exclusive right to meet Trinity's requirements for railcars using the SCRIMP process. Following the jury's verdict declaring that Trinity breached the CSA, True North's post-trial motion seeks the court's approval of its remaining requests for declaratory judgment.

Trinity filed its answer and counterclaims on December 16, 1999. It denied True North's allegation that it breached the CSA and asserted various affirmative defenses. Trinity also counterclaimed that it was True North which breached the CSA and its duty of good faith and fair dealing by failing to produce any carbodies. Furthermore, Trinity alleged that True North breached its implied obligations of good faith and fair dealing under the CSA by refusing to negotiate contract disputes in good faith, demanding Trinity bear costs it was not required to, and unilaterally terminating the CSA without right to do so. Trinity also filed a claim for a declaratory judgment from the court releasing it from the exclusivity provisions of the CSA.

## C. *True North's Case in Chief*

The court draws the following facts from the evidence presented to the jury during the May 2001 trial. To establish Trinity's breach of the CSA, True North presented four witnesses, each of whom detailed the course of conduct between the parties. True North also presented the deposition testimony of other involved persons. Last, True North put on an expert witness who testified to the damages suffered by True North.

### 1. *Alan Henderson*

True North's first witness was Alan Henderson, True North's Director of Engineering for the Gen II carbody. Henderson explained that True North began as HDC, a joint venture between Du-Pont and Hardcore Composites. HDC was led by George Tunis, its CEO and founder. It developed composite products for a variety of uses, including bridges, marine fenders, and railcars.

Henderson explained the Preferred Supplier Agreement entered with Trinity and the course of dealing under that Agreement. He testified that under that Agreement, True North manufactured composite carbodies and Trinity built a steel underframe with wheels and a platform for the composite box to sit on. Using this division of labor, the two parties first built two prototype 68–foot insulated cars and sold them to Burlington Northern Santa Fe Railroad. They then manufactured fifty 72–foot mechanically refrigerated cars, known as Gen I cars, and sold them to Union Pacific.

Henderson testified at length regarding the manufacture of the composite carbody and its secondary floor. He explained that a secondary floor is a surface placed on the carbody's primary floor to lift the cargo off the floor and improve air circulation underneath the freight being carried. Because airflow is unimportant for insulated railcars, the two prototype cars lacked a secondary floor. The Gen I railcars, however, were refrigerated, and therefore required a secondary floor to facilitate air flow. Because freight sits on the secondary floor and railways use forklifts to move cargo in and out of these railcars, both the "static" and "dynamic" load capabilities of the secondary floor are important components of the secondary floor specifications. For the Gen I railcar, the load bearing capabilities, both static and dynamic, of a secondary floor made from composites was studied, but the companies determined they could not manufacture a strong enough composite secondary floor. Thus, the Gen I cars were built with a traditional secondary floor, manufactured by Trinity, made of aluminum and wood. Trinity had requested, in the Gen I specification, a

secondary floor that could withstand 2,000 p.s.i., but even the aluminum and wood secondary floors eventually manufactured by Trinity did not meet that standard. On later cross-examination, Henderson admitted he was unaware why Trinity had originally requested a 2,000 p.s.i. secondary floor because he was not involved in the project at that time.

Henderson testified that the Gen I cars were a successful product, but True North and Trinity recognized that they were too expensive to build and commenced development of an entirely new carbody, known as Gen II, manufactured in separate panels. The Gen II development began in early 1998 with meetings of the Joint Panelization Team. The Joint Panelization Team explored building a secondary floor of composite materials and worked from an assumption that the secondary floor needed to support 417 p.s.i., roughly the pressure caused by the footprint of a fully-loaded 60,000 pound forklift. The Team later switched to assuming a 50,000 pound forklift, requiring the secondary floor to support 348 p.s.i. Because the SCRIMP technology could not produce a composite to meet that pressure level, the Team evaluated having the floor built by an independent contractor, Creative Pultrusions, using pultrusion technology instead of SCRIMP. Henderson produced communications between the parties using the 417 p.s.i. as an assumption in setting forth secondary floor specifications for the contractor. According to Henderson, the parties never discussed a 2,000 p.s.i. secondary floor because it could not be done.

Both the Panelization Team and Creative Pultrusions estimated the secondary floor cost. The panelization team estimated $11,094 per secondary floor, but Creative Pultrusions produced a lower bid of $7,400 using the 348 p.s.i. specification in September 1998.

Henderson testified that the Gen II development program cost True North $400,000 a month, mostly in salaries for its manufacturing employees and its Engineering Group. Its work mostly completed, the Joint Panelization Team disbanded in May or early June of 1998. Though True North continued to work on the Gen II project, Trinity did not work with True North again until November 1998.

In October or November 1998, Trinity informed True North that the Gen II project should plan a 68–foot car, rather than the 72–foot car that had been in development. Henderson testified because the change caused significant problems for his design team, including changes to the carbody panels and tooling for the manufacturing process, all of True North's engineers flew to Dallas to meet with Trinity's representatives. For that meeting, Henderson wrote a memo on open design issues, including secondary floor development. In discussing the load bearing capabilities of the secondary floor, his memo discusses the 50,000 pound forklift standard, which requires a load bearing capability of 348 p.s.i. The memo never references a 2,000 p.s.i. standard.

Henderson testified that at the Dallas meeting Trinity reassured True North that there was a market for composite railcars. Steve Smith of Trinity also told Henderson, for the first time, that Trinity had filed patents or patent applications on some of the technology used in the composite railcar. Henderson testified on cross-examination that after this disclosure, he terminated further design meetings in Dallas to avoid intellectual property problems.

Henderson also testified at length about his role in creating the Preliminary Specifications for the Gen II carbody that were eventually included in the CSA. He explained that the Joint Panelization Team

worked from an older copy of the specification used for the Gen I carbody. While making changes to his copy of the Preliminary Specification, Henderson deleted the 2,000 p.s.i. secondary floor standard that had been abandoned in the Gen I project and substituted the 348 p.s.i. standard the Joint Panelization Team used. While removing it elsewhere, however, Henderson admitted that he accidently failed to remove the 2,000 p.s.i. standard from the section detailing American Association of Railroads (AAR) requirements for flooring. His modifications to the Preliminary Specification were eventually memorialized as part of the Preliminary Specification in the CSA, although the 2,000 p.s.i. had never been contemplated as the load bearing requirement for the secondary floors and that the project's cost estimates assumed a significantly smaller standard. On cross-examination, Henderson would later admit that several other True North employees had reviewed the Preliminary Specification and similarly not identified the 2,000 p.s.i. standard as an error.

Following the execution of the CSA, True North and Trinity began to work together again to develop the Gen II car. According to Henderson, the CSA's provisions indicated that they would continue to work together to develop and improve the specification throughout the project. One of the open issues identified by Henderson for further discussion with Trinity, even after the CSA was signed, was the load requirements of the secondary floor.

Henderson testified during cross-examination that True North's stress analysis expert, John Murphy, together with his counterpart at Trinity, Dilip Niak, studied dynamic flooring standards in December 1999 to evaluate the forces created by braking and turning fully-loaded forklifts. Niak's notes of those tests showed that they used two different forklifts, a 50,000 forklift with a wheel base of 13 inches by 5 inches, and a 10,000 forklift with a wheel base of 7 inches by 1 inch. Those tests showed pressure levels, respectively, of 666.7 and 1,333.3 p.s.i. for horizontal braking loads and 347 and 714 p.s.i. caused by steering twist conditions. Niak sent a letter to True North on January 12, 1999 which referenced a Trinity "requirement" of 1,500 to 2,000 p.s.i., but recited a static load standard of 417 p.s.i. Both of these pressures were higher than the 348 p.s.i. standard for a 50,000 pound forklift with which True North had been working. Henderson admitted that in January 1999, John Murphy contacted various forklift truck manufacturers and wrote a letter to Trinity, dated January 27, 1999, that included information he learned from the manufacturers. While reviewing a draft of that letter, Henderson deleted the section of the letter dealing with secondary floor standards. Henderson explained on cross-examination that he deleted that section of the letter, before sending it to Trinity, because the team of engineers working on the project had not reached conclusions on the subject.

On cross-examination, Henderson admitted that, based on the correspondence between Murphy and Niak, Trinity and True North were in general agreement in February 1999 that the secondary floor standards should meet a 714 p.s.i. standard. This was higher, however, than the 348 p.s.i. standard contemplated when estimates for the CSA were received and would require significantly more expense to meet.

Henderson testified that Trinity's cooperation in the carbody development was slow throughout this period and that Trinity engineers would not come to True North's facilities in New Castle, Delaware to resolve the open design issues. Trinity continued to revise various specifications for the carbody throughout July 1999, al-

though the CSA required the first car to be delivered in August of that year.

Henderson testified that in June of 1999, Duncan Gillies of Trinity informed True North's engineers that Trinity could not sell a 68-foot composite car and instructed True North to begin work on a 72-foot car. As a result, True North informed the tooling manufacturers to stop work. Henderson estimated the change to a longer railcar would require a couple of months to complete. During this period, Henderson received memoranda from Steve Smith of Trinity, who had began meeting with its customers, including Burlington Northern and Union Pacific, to evaluate what load bearing requirements were necessary for the secondary floor.

On July 7, 1999, Henderson participated by conference call in a meeting at the offices of True North Partners in Arizona. Henderson remembers that during that call Trinity asked True North to build the secondary floor of the carbody to a 2,000 p.s.i. standard. It was only at this time that Henderson realized he mistakenly had left a reference to the 2,000 p.s.i. standard in the specification appended to the CSA. Henderson described Trinity's request as "crazy" and stated that True North could not meet that standard within its cost estimates for the project. Henderson testified he sent a draft proposal to resolve the secondary floor issue on July 16, 1999 to Steve Smith of Trinity. In response, he was told by another Trinity representative that "it's not an engineering issue. The businesspeople have to answer."

Henderson testified that True North continued to work on the Gen II project until the end of August 1999, when it shut down its operations. Its 60 New Castle employees were furloughed with pay for two weeks in an attempt to resolve the outstanding issues with Trinity, but were eventually released. True North's assets were auctioned off in November 1999.

### 2. Michael Ahearn

True North's next witness was Michael Ahearn, a partner in True North Partners. Ahearn testified that True North Partners was founded in 1996 by himself, Mike Pierce, and John Walton. The partnership attempts to identify and invest in companies with innovative products that could grow to be substantial, important companies. One of those companies was HDC, in which Walton had invested $3 million before True North Partners was formed. According to Ahearn, HDC was led by George Tunis, who was part-owner and founder of the company. DuPont owned 49% of HDC, and the remaining 51% was owned by Hardcore Composites LLC, a partnership of Tunis, Brock Vinton, and John Walton. After the formation of True North Partners, Walton transferred his $3 million investment in HDC to the partnership.

According to Ahearn, Tunis was interested in securing more funding for HDC and DuPont wanted to sell its investment in the company. To accomplish both, Tunis sought the interest of a carbon fiber company called Zoltek, which expressed interest in purchasing DuPont's share of HDC. Ahearn and True North Partners, as a minority owner of HDC, worked with Tunis to put together a deal with Zoltek, but that transaction eventually failed. According to Ahearn, Trinity, after learning of the proposed transaction with Zoltek, sought and received an ex parte temporary restraining order from a Texas state court in Dallas to halt the Zoltek–HDC transaction. On cross-examination, he admitted that Zoltek did not oppose the temporary restraining order and actually requested it be extended three times to facilitate further negotiations. Moreover, it was HDC, and not Zoltek, that eventually terminated the parties' negotiations when a series of

letters in May 1998 revealed that they remained apart on important issues.

Ahearn testified that Trinity decided to oppose the transaction because it disliked Tunis's continued leadership of HDC. Ahearn then had a discussion in May 1998 with Duncan Gilles of Trinity in which Trinity indicated that it would use the courts to prevent the Zoltek transaction even if the result was that HDC ran out of funding without finding a new partner for DuPont's share. According to Ahearn, Duncan Gilles of Trinity repeatedly ·suggested to him that True North Partners should take a controlling interest in HDC and replace Tunis. Ahearn admitted on cross that Tunis was disliked by not only Trinity, but also DuPont and Vinson. Gilles also suggested that after True North Partners acquired HDC, it should sell off the companies other composites businesses to focus solely on railcar building, which he described as a market in the "tens of thousands."

Ahearn testified that on May 18, 1998, True North Partners bought DuPont's interest in HDC for $1.28 million. True North Partners removed Tunis from the board, renamed it True North Composites, LLC, and invested funds in the company, including $500,000 in June, $400,000 in July, and $800,000 in August. Ahearn testified that throughout the summer and fall of 1998, True North expected to sign a contract for the development of the Gen II cars with Trinity, but could not get Trinity to agree on specific commitments. By December 1998, the parties reached a basic agreement. According to Ahearn, True North could not afford to wait until all the details of the railcar's specification were finalized because it was losing money. The CSA thus provided that the parties would further negotiate later changes to the specification made necessary by either Trinity's customers or True North's design team.

Ahearn testified that True North estimated its sunk costs in developing the Gen II railcar, described in the CSA as "Learning Curve Costs," at $5 million, and thus structured the CSA so that True North could recoup those costs over the first 2,000 railcars. True North also factored in a 10% profit margin, which was enough to recoup further estimated investments in manufacturing of $4 million, over the first 500 cars. True North believed that the CSA assigned to it the risk of whether it could produce a finished railcar and recoup its investments, while Trinity bore the risk of selling the railcar to the market. While True North recognized the peril of entering an agreement without finished specifications, it believed that the CSA, if executed, permitted it to require a higher purchase price if Trinity required modifications imposing additional costs on True North.

As True North Partners grew more confident in late 1998 that it would enter an agreement with Trinity, it purchased Tunis's interest in the company for $3.6 million, leaving only True North Partners and Brock Vinton as owners of True North. True North also divested the other non-rail portions of the company. It sold its construction business to Harris Specialty Chemicals. On cross-examination, Ahearn admitted that True North later sued a company that acquired· Harris to protect certain intellectual property rights, in much the same way as Trinity had acted to stop the Zoltek–HDC transaction.

Ahearn testified the CSA was finally agreed to on December 22, 1998, and was executed by the parties at various times at the end of December 1998 and early January 1999. The prices for carbodies in the CSA were based on the cost estimates developed by the Joint Panelization Team. In addition to the cost to build the carbodies, the·CSA added an additional payment

by Trinity to True North of $5.2 million to reimburse True North's costs to develop the Gen II car, described in the CSA as "Learning Curve Costs." The Learning Curve Costs were to be spread equally over the first 2,000 railcars produced. The CSA also provided that Trinity would regularly reimburse True North for the "Tooling and Equipment Costs" it expended in preparing to manufacture the Gen II railcar. Ahearn also testified that the unreimbursed Learning Curve Costs and Tooling and Equipment Costs became immediately payable to True North, under Section 4.2 of the CSA, if True North properly terminated the CSA for Trinity's breach. According to Ahearn, if the parties could not agree on a modification to the Preliminary Specification and, as a result, the carbodies were not produced, then Section 4.2 mandated that Trinity immediately pay True North all its Learning Curve Costs and Tooling and Equipment Costs.

Ahearn also discussed Section 10 of the CSA, which explains termination by either party. Section 10 requires notice of termination and a period for the other party to cure of either 45 or 90 days, depending on the type of breach. Ahearn noted that in the event True North properly terminated for Trinity's breach, Trinity would have to pay the unreimbursed Learning Curve Costs and Tooling & Equipment Costs immediately.

Ahearn also testified that True North and Trinity worked together to solve most cost problems. For example, True North erred in its estimates of volume pricing from its vendors and it voluntarily assumed the resulting cost increase of $2,000 per carbody. True North and Trinity shared a cost increase caused by another Trinity design change, True North accepted an increase in material costs of $1,200 per carbody and Trinity paid for four to

six hundred thousand dollars in extra tooling costs.

The parties could not resolve, however, the secondary flooring issues. Ahearn testified that he learned the secondary floor estimate was too low in March 1999, and afterwards began working with Duncan Gillis of Trinity to resolve the issue. Ahearn admitted that True North refused to absorb the extra $5,000 per carbody cost of the enhanced secondary floor standard because it would eliminate True North's profits.

Ahearn testified that on June 15, 1999, he participated in the teleconference in which Trinity announced that it wanted to move from a 68–foot railcar to a 72–foot railcar. While the 72–foot railcar had been contemplated when the parties began discussions about an agreement, it was a 68–foot railcar that had been specified for the first 500 deliverable under the CSA. According to Ahearn, at no time did Trinity share with True North, as requested, why it could not sell the 68–foot railcar or provide assurances it could sell a larger one. Ahearn testified that, following the teleconference, he authorized Alan Henderson to complete some unfinished design work on the 68–foot railcar, but otherwise instructed him to immediately cease developing the shorter car, including contacting vendors and stopping their operations.

Ahearn testified that, through his lawyer, he sent a letter to Trinity on June 22, 1999, stating that True North considered Trinity's change a material breach of the CSA and that it wanted further assurances of the market for the 72–foot car before beginning that project. In response, Patrick Wallace of Trinity sent Ahearn a letter dated June 25th stating that Trinity did not order True North to stop work on the 68–foot car. Wallace's letter also announced that Steve Smith of Trinity would

be coming to True North's New Castle facility to work with True North on both the 68 and 72–foot railcars. A similar letter from Jesse Collins reiterated that Trinity never ordered True North to stop work on the 68–foot car, a position that Ahearn considered 180 degrees from the position taken by Trinity during the June 15th teleconference.

Ahearn testified that he arranged a meeting with Trinity on July 7, 1999 at True North Partners' offices in Arizona to discuss the uncertainty attending the project. At that meeting, True North and Trinity representatives debated what had been said in the June 15th teleconference. They also discussed the secondary flooring issue, which Ahearn did not remember arising during the June 15th teleconference. Ahearn explained that Patrick Wallace of Trinity, who was new to the project, suggested that True North should bear the extra costs of building the secondary floor in exchange for Trinity bearing the increased tooling costs. Ahearn disagreed and the issue was considered one of several open areas for further consideration.

Ahearn testified that when the engineers on both sides met after the meeting, Trinity took the position, for the first time, that the secondary floor had to be built to a 2,000 p.s.i. standard, as recited in the Preliminary Specification, and True North had to bear the attendant cost. True North took the position that such a secondary floor was a modification to the parties' agreement and as such Trinity must bear the costs.

At an impasse, True North prepared a memo, dated July 26, 1999, for Trinity detailing four options for moving forward with the CSA. Ahearn testified that the four options included: (1) producing the first 500 68–foot railcars with a composite secondary floor at a price of $82,000, an increase from the base price of $76,722 set forth in the CSA; (2) producing 500 68–foot railcars with wood secondary floors at a price of $78,000; (3) producing 500 68–foot railcars with no secondary floor at a price of $70,000; and (4) True North would transfer its operations to Trinity entirely, for which Trinity would pay True North the Tooling and Equipment Costs, the Learning Curve Costs, and a $6,000 per railcar royalty. In a letter dated July 29, 1999, Patrick Wallace of Trinity explicitly rejected the four options and stated that Trinity expected True North to fulfill its obligations under the CSA. The letter also stated that True North's cessation of the 68–foot carbody production may be a breach of the CSA. Ahearn replied in a letter dated August 4, 1999 in which he summarized the parties' positions. The letter states that True North questioned Trinity's good faith over the period since the June 15th phone call. It also stated that the 2,000 p.s.i. standard was inadvertently included in the preliminary specification and that it had been removed elsewhere. Thus, True North believed that it and Trinity had agreed to a 714 p.s.i. standard and that its estimates had been developed with that understanding. Ahearn's letter also stated that True North would wind down its operations on August 15, 1999 and sell its New Castle real estate.

Ahearn testified that True North Partners invested substantially in True North during its ownership, including investments of $945,000 in September 1998, $900,000 in April 1999, $400,000 in July 1999, and $600,000 in August 1999. In August 1999, True North put its employees on paid leave and attempted to restart negotiations with Trinity. Ahearn testified that on August 15th, Patrick Wallace called him and suggested continuing the 72–foot railcar project and renegotiating all prices going forward. Due to the late hour and Trinity's course of conduct, Ahearn refused Wallace's offer to negotiate

and the True North operations were closed.

### 3. *Michael Pierce*

True North's next witness was Michael Pierce, another partner in True North Partners. Pierce recounted many of the events detailed in Ahearn's earlier testimony about how True North Partners became involved with HDC, the failed HDC—Zoltek transaction, and True North Partners' eventual acquisition of DuPont's interest in HDC. He explained that True North Partners became involved with HDC because it believed the composite railcar program was viable. On cross-examination, he admitted sending a January 9, 1998 later in which he estimated that HDC would require $17 million in investment to break even over 1998–2000. That estimate, however, included the continuation of HDC businesses that were later sold. Pierce also admitted that, much like Trinity's temporary restraining order on the Zoltek transaction, True North brought a suit to enjoin the acquisition of Harris Speciality Chemicals when True North believed its intellectual property rights were threatened.

Pierce testified about the efforts of the Joint Panelization Team to develop the Gen II railcar through most of the first half of 1998 and explained how urgently True North wanted to execute an agreement with Trinity to build the Gen II car so that it could recoup its increasing investment in the company. Pierce testified that after True North dismissed George Tunis, he received reports directly from the various managers of the company until he recruited Vince Poleo, an experienced manufacturing executive, to be the general manager.

Pierce testified that, as of June of 1999, True North's plans on the Gen II project were proceeding smoothly and True North continued to work on various outstanding design issues with Trinity, including debates over costs and tooling. He testified that a couple of days before June 15, 1999, he and Ahearn received a call from Duncan Gillies of Trinity in which Gillies said Trinity could not sell any of the 68–foot railcars and suggested that the companies begin exploring production of a 72–foot railcar. A second conference call was conducted on June 15, 1999, which included Alan Henderson, Vince Poleo and Nick Matthews at True North's New Castle facility, and Gillies, Jesse Collins, and Steve Smith from Trinity. At the time of that call, True North had already received much of the tooling for a 68–foot car and planned to receive more. On the call, Pierce restated to Trinity's representatives the content of what Gillies had said earlier and confirmed that changing car lengths continued to be Trinity's position. Pierce explained that he was absolutely sure Trinity told True North to stop production of the 68–foot railcar. He testified that True North relied on Trinity to test and develop the market for composite railcars because selling the railcars was a risk Trinity assumed in the CSA.

Pierce testified that Trinity representatives, including Steve Smith, Duncan Gillies, Patrick Wallace, and Jesse Collins, came to the True North Partners' offices in Arizona for a meeting on July 7, 1999, at which Trinity's representatives denied ever telling True North to stop making the 68–foot railcars. Pierce stated that, at the end of that meeting, Trinity brought up the 2,000 p.s.i. standard for the secondary floors for the first time, although none of the outstanding design issues were resolved at that meeting.

Pierce testified that he helped Ahearn draft the July 26th letter to Trinity detailing the four options for moving ahead with the 68–foot railcar. Under option one in that letter, in which the railcar would be

sold for $82,000, Pierce stated that True North's profit margin would probably be 5%, or roughly half the 10% profit margin originally estimated.

Pierce explained that True North's decision to close its New Castle facility was made after Trinity rejected all four options True North proffered and had stonewalled on continuing to work through design issues. Without a resolution in sight and with a cost of $400,000 a month for True North to pay its employees, Pierce and Ahearn decided to close the New Castle facility. On cross-examination, however, Pierce admitted that Trinity's letter rejecting the four options included a request for a meeting and that True North denied that request. Pierce testified that on August 23, 1999, the day after the first railcar was to be delivered to Trinity, Trinity sent a letter to True North terminating the CSA. The letter did not mention allowing True North a cure period, as provided in the CSA.

Pierce also testified on cross-examination that if True North won its suit, some of the damages it recovered would be distributed to True North Partners, including himself, Michael Ahearn, and John Walton. Pierce also explained that some of the money would also be distributed to Brock Vinton, another owner of True North.

### 4. *Vincent Poleo*

True North's next witness was Vincent Poleo, who joined True North to become general manger of the New Castle facility in July 1998, shortly after the Joint Panelization Team agreed to move forward on Gen II. Poleo testified that after the CSA was signed, True North was unable to get Trinity engineers to come to New Castle to work with True North engineers on finalizing the design of the Gen II railcar. In a letter he wrote to Mell Thoman of Trinity on January 28, 1999, Poleo explained that almost a month had passed since the CSA was signed and True North had received no input from Trinity during that period. Among the items for further discussion that Poleo identified in his letter was the secondary floor, although Poleo mistakenly referred to it as the primary floor because the nomenclature for the various floors was unsettled at the time. On cross-examination, Poleo testified that True North's senior stress analyst, John Murphy, and his counterpart at Trinity, Dilip Niak, met in January 1999 and discussed static and dynamic load requirements in the range of 350 to 714 p.s.i. He also stated that lower standards would decrease the cost to build the secondary floor. Poleo also testified that, despite Trinity's delay, True North was still capable of producing the first 68–foot railcars by the August due date as of June 15, 1999.

Poleo testified that, as the work on the Gen II railcar progressed, mistakes in the initial estimates were revealed, including the volume pricing error and cost overruns on tooling. Poleo stated that he met with Trinity representatives in early April 1999 and the parties assigned responsibility for the errors. Trinity agreed to assume the increased tooling costs and True North absorbed the costs for the volume misestimation, which he admitted was True North's mistake, and some other design costs. The cost overrun for the secondary floor was about $5,000 to $6,000 per railcar and Poleo testified that True North refused to assume this increased cost. He stated that Trinity and True North worked together in the spring and early summer of 1999 to find ways to save costs on the secondary floor. During the period the companies worked together, Trinity never committed to a specific load requirement for the secondary floor until July 1999, when, for the first time, it demanded the secondary floor meet 2,000 p.s.i.

According to Poleo, Trinity agreed to bear any increased tooling costs because it was required to pay for those costs under the CSA and it would own the tooling once the CSA was completed. Until True North closed its operations, it paid $1.77 million for tooling to various vendors, of which Trinity reimbursed True North about $1.36 million.

Poleo also testified about the Learning Curve Costs incurred by True North, which were mostly its labor costs, for which Trinity was to reimburse True North in regular per railcar payments over the life of the CSA. He explained that True North tried to minimize these costs by finding temporary employment for its experienced manufacturing laborers while the companies continued to design the Gen II railcar. Poleo estimated that True North's Learning Curve Costs were expected to be $5.18 million, but because True North discontinued its operations early, it had only spent $2.8 million, including interest, at that point. True North introduced quarterly summaries it prepared for Trinity detailing these costs.

Poleo also testified that he participated in the June 15, 1999 teleconference with Trinity, but entered the call late because of an earlier meeting. He heard Trinity inform True North to shift to 72–foot railcars and to stop work on the 68–foot railcars. Poleo estimated the switch would take 4 to 6 months, a delay caused largely by tooling changes, and require at least an additional $1.6 million in Learning Curve Costs. The next day, True North employees informed its tooling vendors to stop work. On cross-examination, Poleo stated he was aware that Trinity sent letters to True North, in the aftermath of the teleconference, stating that it wanted to receive the 68–foot railcar. He testified that after receiving this instruction, True North resumed design and tooling work on the 68–foot railcar.

Poleo further testified that he attended the July 7, 1999 meeting in Arizona. Poleo stated that Trinity told True North at the meeting that it wanted to finalize the secondary floor specification at that meeting. Steve Smith of Trinity then raised the 2,000 p.s.i. standard for the first time.

Poleo testified that, following the Arizona meeting, he helped develop the four options presented to Trinity in August 1999. Some of those options substantially limited True North's expected profits, including option one, which would halve its 10 percent profit margin. Another True North employee, Nick Matthews, told Poleo that Patrick Wallace of Trinity had told him why Trinity rejected option four, in which True North offered to let Trinity buy the company. Wallace allegedly told Matthews, Poleo testified, "[w]hy should he buy the business when he can get it for free."

Poleo also testified that True North paid $365,000 in severance payments to its 60 employees when it closed the New Castle facility and he introduced documents supporting those payments. He also introduced invoices from one of the tooling manufacturers which documented True North's monthly payment of $5,000 to store unused molding for the 68–foot railcar. Last, Poleo introduced a document summarizing the $175,110 True North received when it auctioned its tools and plant fixtures.

On cross-examination and re-direct, Poleo testified to a number of matters relating to the CSA. He testified that, under the CSA, the first 500 cars were ordered based on a series of milestones. For example, Trinity's commitment to receive the second release of 50 cars would only become firm upon its receipt of the first release of 20 cars meeting the specifications. Moreover, while the CSA addressed the delivery of up to 2,000 carbodies, Trini-

ty was only obligated to purchase the first 500. Furthermore, Poleo testified that the CSA's specifications included plans for two 68–foot railcar designs and two 72–foot railcar designs and the parties anticipated switching between the two at some later point.

### 5. *Deposition Testimony*

True North introduced deposition testimony from a number of witnesses. The first deposition was that of Clay Estes, who was in various sales manager positions with Trinity until March 2000, when his job was eliminated. He reported to other Trinity employees involved in this litigation, including Duncan Gillies, Mell Thoman, and Jesse Collins. Estes discussed a marketing report on which he did substantial work entitled "An Industry Profile Setting Forth Research with Regard to Industry Interest in Composite Cars." The report, compiled by contacting companies interested in buying composite cars, detailed the number of carloads in which each purchaser might be interested and the relative amount of interest they had in composite railcars. It showed that while some railcar purchasers were interested in either a 72–foot or 68–foot composite railcar, there was considerably more demand for a 72–foot railcar. Estes also discussed a letter from Duncan Gillies of Trinity to George Tunis of HDC, in which Trinity forecasted the demand for composite boxcars at 500 for 1998 and with higher numbers in succeeding years. Estes also discussed another letter from Mell Thoman to Tunis, dated April 22, 1998, in which Thoman stated he believed the composite railcar market to be strengthening. Last, Estes testified to another report from the same time period which stated that several purchasers sought 72–foot railcars. Among those purchasers was Union Pacific, which was interested in replacing their entire fleet with 72–foot composite railcars. Despite these indications of a vibrant market for 72–foot railcars, Estes testified he was unaware why Trinity chose to order 500 68–foot railcars in the CSA. He remarked, however, that a 68–foot railcar was more attractive to some buyers, especially juice shippers.

According to Estes, Trinity proposed to Burlington Northern in June 1999 that it purchase 68–foot railcars and that Trinity would later replace those railcars with 72–foot railcars in exchange. He testified that Burlington Northern appeared prepared to purchase 68–foot railcars at a July 13, 1999 meeting.

True North also offered the deposition of Charles Short, a representative of Burlington Northern Railway who conducted purchasing for the company. At that deposition, Short testified that Burlington Northern refused the 68–foot railcars at a meeting with Trinity in March 1999. Instead, Burlington Northern was interested in 72–foot railcars so that it might capture a larger share of the profitable french fry shipping market. Short testified that in July 1999, Burlington Northern's leadership ended its project to purchase additional refrigerated railcars. This project was later resurrected and Burlington Northern agreed, on August 25, 2000, to purchase 700 refrigerated boxcars from Trinity over the next two years. He described the purchased railcars as conventional, steel railcars that were high-tech.

True North also offered portions of its deposition of Patrick Wallace, President of Trinity's Freight Car Division. Wallace testified that he spent only 5% of his time during the first half of 1999 on the composite railcar program and that the CSA was negotiated before he assumed his position. He did not participate in the June 15, 1999 teleconference, but was in attendance at the July 7, 1999 meeting with True North. In preparation for that meeting, he reviewed the CSA, but did not consider ter-

minating it. On the plane to Arizona, he discussed the 2,000 p.s.i. standard with other Trinity employees for the first time.

True North presented portions of the deposition of John Murphy, True North's stress analyst. Murphy testified that he worked with Dilip Niak of Trinity from late 1998 through July of 1999 on the secondary floor of the Gen II car. According to Murphy, Trinity never set out its final requirements for the floor's vertical load, horizontal braking load, or steering twist load. Nor did Trinity's representatives, Niak and Al Norton, who met with Murphy on July 22, 1999, ever state that they required 2,000 p.s.i., except in one document. That document is a series of notes written by Niak to Murphy on January 12, 1999, in which he sets forth Trinity's requirement of 1,500 to 2,000 p.s.i., among other estimates that are significantly lower.

True North presented the deposition testimony of Al Norton of Trinity. Norton testified that he believed True North and Trinity had reached consensus on the secondary floor requirements by February of 1999, based on the dynamic load work of Dilip Niak and John Murphy. He met with Steve Smith of Trinity in June of 1999, however, and the two discussed making further reductions in the cost of the railcar by lowering the secondary floor's load standards. Norton also met with True North representatives in July 1999 for continued talks about finding savings costs on the secondary floor, but never arrived at a definite standard before the project ended.

Norton also testified that after Trinity's relationship with True North ended, he began work in 2000 on a project called TrinCool. The TrinCool project was a refrigerated railcar with a composite roof and floor for sale to Burlington Northern. The secondary floor of the TrinCool railcars was made of aluminum and was de-signed to carry the same loads as had been contemplated in the Gen II project.

True North then introduced portions of the deposition testimony of John Nussrallah, a Trinity employee. Nussrallah testified in his deposition that Trinity was selling 700 72–foot refrigerated railcars to Burlington Northern under the TrinCool name. Each was sold at a price of $170,000.

True North next introduced portions of the deposition testimony of Nick Matthews. Matthews became director of Trinity's composite railcar program in March 1999, after Mell Thoman was terminated by Trinity. Matthews stated that he created a "Cliff Notes" version of the CSA for Patrick Wallace in anticipation of the July 7, 1999 meeting with True North in Arizona, which he attended. He stated that Trinity had not previously required the secondary floor to meet 2,000 p.s.i. standard and that Trinity did not make such a demand at the July 7 meeting. Rather, Matthews testified it was True North which stated at the meeting that it would build to that standard. After receiving the letter from True North detailing the four options for continuing that it proposed, he prepared an internal memorandum examining those options. He recommended that Trinity pursue offer one and counteroffer to purchase 150 of the 68–foot carbodies at a price of $81,000 for carbodies with a True North-built secondary floor, or $68,000 without it. The $81,000 price he suggested was $1,000 less than the $82,000 that True North had offered. Despite Matthews' recommendation, Patrick Wallace rejected all four of the True North options in favor of continuing with the current contract.

Matthews also testified that, following True North's closing of its New Castle operations, he was instructed by Jesse Collins and Patrick Wallace to not pay

$138,000 in tooling costs requested by True North, even though that amount would not take Trinity's spending over the $1.635 million limit in the CSA because it had only paid $1.36 million to that point.

Last, True North presented the deposition testimony of Dilip Niak, the Trinity engineer who worked with John Murphy on load requirements for the secondary floors. Niak testified he frequently met and talked with Murphy during January and February of 1999. He testified he was aware that True North and Trinity had agreed to reduce their load requirement specifications to assume a 50,000 pound forklift, rather than the 60,000 pound forklift originally proposed and explained that his goal in early 1999 was to meet the standards of the AAR. In July 1999, he was instructed by Al Norton to reduce the secondary floor standards further.

### 6. *Donald Pfingstler*

True North's last witness was Donald Pfingstler, an accountant and expert witness on True North's damage claims. Pfingstler estimated True North's damages at an amount in excess of $28 million. The damages were made up of four components; lost profits, diminution in True North's business value, unreimbursed nonrecurring costs such as Tooling and Equipment Costs and Learning Curve Costs, and closure costs.

With respect to lost profits, Pfingstler began with the assumptions that Trinity's conditional orders of railcars would become firm orders and that True North properly terminated the CSA on September 2, 1999. If those assumptions were wrong because Trinity was the first to properly terminate, Pfingstler admitted on cross-examination, his calculations would be incorrect. He divided the lost profits under the CSA into groups to make that calculation. For the first 100 railcars, he began at the estimated profit figure of $7,271 from the CSA, he then added the additional $4,200 specified in the CSA, and subtracted the increased material costs caused by the volume pricing errors, which he estimated at $2,000, for a total profit per railcar of $9,872. For the next 170 cars, he performed the same calculation without the volume pricing errors, which were no longer applicable once True North was producing railcars of this number, for a profit per car of $11,872. For the last 230 cars of the first 500, Pfingstler estimated the profit was $7,271 per railcar because the $4,200 addition was no longer applicable. He then summed those totals to arrive at the nominal profit, increased the nominal profit at 10% for interest, and discounted the nominal profit to account for the fact that True North would be receiving the money earlier than it would have under the CSA if it received judgment. His total was $5,062,028 for lost profits on the first 500 railcars.

For the next 1,500 railcars, Pfingstler assumed that True North would be building the 72–foot carbodies. He used the estimated cost figures on the 72–foot carbodies and the price formula contained in the CSA to arrive at a price of $92,940, of which $9,294, or 10%, would be profit. Multiplying that profit by 1,500 railcars and then discounting that nominal profit at a rate of 10%, Pfingstler calculated the total profit, at present value, on the next 1,500 railcars to be $12,025,506.

Moving to the diminution in True Value's business value, Pfingstler testified that these damages sought to recover the value of True North as a going concern, with its workplace in force and the ability to perform, at the time Trinity breached the CSA. Pfingstler assumed True North could produce 500 cars a year indefinitely, assumed inflation would be 3%, and used an annual discount factor of 25%. Pfingstler then estimated the diminution in busi-

ness value based on two variables, profit level and the ending point of the CSA, either 500 or 2,000 cars. The two profit levels were 10%, as provided in the CSA, and 6.5%, which subtracted the cost of a 3.5% royalty on future projects. At a profit level of 6.5% and completing work for Trinity after 500 railcars, True North's business value would be $13.7 million. At a profit level of 6.5% and completing work after 2,000 railcars, the business value would be $7 million. The 2,000 figure is less than the 500 because completion of the additional 1,500 railcars would take time and therefore the business value would be further discounted. Pfingstler also produced calculations showing True North's business value at a profit level of 10% and at production runs of 500 or 2,000 railcars, but those figures were contained on a demonstrative and Pfingstler neither testified what they were in court nor did True North introduce the demonstrative in evidence.

Pfingstler's next testified that the value of the unreimbursed non-recurring costs payable under the CSA, such as Tooling and Equipment Costs and the Learning Curve Costs, was $484,334 and $3,226,770, respectively. Both figures assume a 10% interest rate. Pfingstler also set forth the closure costs for True North, which included severance pay and storage of the tooling and molds. The closing cost, reduced by the revenue produced in True North's tools and fixtures auction, was $302,965.

Pfingstler also criticized the damages Trinity sought on its counterclaim. He testified that the damages estimated improperly included assets from the Gen I project and failed to account for assets put to other uses after the Gen II project closed.

On cross-examination, Pfingstler acknowledged that the carbodies were to be delivered on a schedule detailing certain milestones. At first, 20 carbodies were to be shipped and the subsequent order of 50 carbodies was conditioned upon the first 20 meeting specifications. Moreover, there was no requirement that Trinity purchase more than the first 500 carbodies. Pfingstler was also challenged on his use of 10% profit per car as an assumption. He acknowledged the price of the first 500 cars was fixed and that therefore increasing costs to build the carbody would diminish profits, but testified that he believed True North's cost estimates, on which he based his assumption, were more accurate than any estimate he could prepare and were therefore reliable. He admitted that he assumed any changes to the design specifications of the carbodies would be mutually agreed by the parties and involve no cost increase in the first 500 carbodies.

### D. The Defendant's Case In Chief

In support of its breach of contract claim against True North, Trinity presented five witnesses from Trinity and the deposition testimony of John Murphy, True North's stress analysis expert. Trinity also brought its own expert to testify to its damages from True North's alleged breach and to criticize True North's damages calculations.

Trinity's first witness was Steve Smith, Trinity's Vice President of Research and Development for the Railcar Division and an active participant in the AAR, the standard-setting body for railcar producers. Smith testified he first became involved with HDC in 1994, when the two companies jointly created two prototype composite railcars. Those two cars were insulated, had no secondary floor, and were to be sold to Coors for beer shipping. He testified that the Coors project was the genesis of the 2,000 p.s.i. standard for railcar flooring. In discussing flooring requirements with Coors, Smith noticed that Coors used smaller tires on its forklifts than set forth

in the AAR standards. He explained that smaller tires meant less of a "footprint" for the forklift and therefore less space over which to distribute the vehicle's pressure. Coors' forklifts exerted 1,142.0 p.s.i. of pressure on the forklift wheels. To allow for a margin of error, Trinity discussed building primary flooring to a 1,500 p.s.i. or 2,000 p.s.i. standard and eventually settled on the latter. Smith testified on cross-examination, however, that the 2,000 p.s.i. standard was not required by the AAR.

HDC and Trinity later produced 50 Gen I railcars for Union Pacific in 1997 and 1998. According to Smith, the Gen I project was plagued by many manufacturing and design errors made by HDC. Although HDC originally committed to building the secondary floor, it backed out of that responsibility when it had technical problems and Trinity later installed an aluminum secondary floor in the cars. Smith testified that the Joint Panelization Team working on the Gen II railcar developed specifications for a 72–foot railcar, but that Trinity decided to order a 68–foot railcar in late 1998, despite its lack of firm orders for the shorter car. With the CSA close to being signed, the Joint Panelization team met in December 1998 to complete design work but Alan Henderson of True North cut the December 1998 meeting short, Smith testified, out of a fear of disclosing intellectual property.

Smith also testified that the inclusion of the 2,000 p.s.i. standard for the secondary floor in the Preliminary Specification was not a mistake and that he intended that standard to apply. He admitted, however, that he did not remember the Joint Panelization Team ever discussing that standard. To explain why a 2,000 p.s.i. standard was important, Smith discussed the notes of Dilip Niak, Trinity's stress analyst, in which Niak discusses the pressures caused by a 16,000 pound forklift. That forklift had a tire print of 1 by 7 inches over which to spread its weight, resulting in a pressure of 1,143 p.s.i., according to Niak's notes, which were also sent to John Murphy of True North. According to Smith, this calculation was similar to the one done for the primary floor of the prototype railcar. Niak's notes also listed a "Trinity Requirement" of 1,500 to 2,000 p.s.i. Smith testified he believed Trinity and True North had agreed to the standards Niak suggested by early February of 1999.

Smith testified he was first informed of a cost overrun on the secondary floor by True North's Alan Henderson sometime around March 1999. Henderson reported to Smith a cost overrun of $5,000 to $5,500 on the secondary floor and provided as support a spreadsheet showing an estimate from Creative Pultrusions that the secondary floor would cost only $7,200. Smith also introduced a spreadsheet from the Joint Panelization Team in which the secondary floor was estimated to cost $12,529.

Smith testified that he, as well as Duncan Gillies, Jesse Collins, and Nick Matthews, participated in the June 15, 1999 teleconference with True North. Smith discussed his notes from that meeting, which show that the parties discussed transitioning from a 68–foot carbody to a 72–foot carbody. According to Smith, no one at Trinity every instructed True North to stop work on the 68–foot carbody. One of the options discussed was having True North build its initial run of 20 68–foot carbodies and then move on to 72–foot carbodies, but True North's engineers reported this was a bad idea because they would have to simultaneously supervise the 68–foot carbody manufacture while completing the design of the 72–foot carbody. Smith testified that Trinity continued building 68–foot railcar undercarriages in June and July of 1999. He also introduced his notes from a June 23, 1999 trip he took

to True North's facilities in New Castle in which he stated he spent 70 to 80% of his time on design issues for the 68–foot car. Furthermore, Smith testified that Trinity entered negotiations with Burlington Northern around July 13th or 14th for Trinity to sell around 100 to 150 68–foot railcars to Burlington, if Trinity would later swap 72–foot railcars for the 68–foot railcars when the 72–foot railcar became available.

Smith also testified that he attended the meeting in Arizona on July 7, 1999 and explained how the 2,000 p.s.i. standard came up at that meeting. He explained that Alan Henderson declared at the meeting that True North would build the secondary floor to the required specifications. In response, Smith asked if he was referring to the 2,000 p.s.i. standard in the CSA. Henderson said yes, which surprised Smith because he believed Trinity had not imposed that standard on True North. After that meeting, Smith was telephoned by Henderson to explain that he misspoke and that True North could not build a composite secondary floor meeting ·that specification. Smith testified that in late July 1999, he sent Al Norton and Dilip Niak to New Castle to discuss the secondary floor with True North and, at that meeting, Niak and Norton worked with the notes Niak had written in February 1999. By letter dated July 29, he agreed to halve the required secondary floor standard by assuming the forklifts had a larger footprint and by reducing the assumed coefficient of friction.

Smith also testified about Trinity's Trin-Cool project with Burlington Northern and stated that the TrinCool railcar does not use the SCRIMP process.

### 2. Deposition Testimony—John Murphy

Trinity next introduced further deposition testimony from True North's stress analyst, John Murphy. Murphy stated that both he and Alan Henderson reviewed the Preliminary Specifications before the CSA was executed. He also testified at his deposition that he and Dilip Niak had worked out the load requirements by January 1999 and that Steve Smith had proposed a limit of 600 p.s.i. in February of 1999. Murphy believed that a load requirement in the range of 600 to 800 p.s.i. to be appropriate. He explained that he was unaware that Trinity recommended decreasing the load requirements in late July 1999, but said he had been told at about the same time by True North management to stop discussing the secondary floor issues with Trinity.

### 3. Barry Buchanan

Trinity's next witness was Barry Buchanan, Trinity's Vice President of Material Services for its Railcar Division. Buchanan testified at length regarding why Trinity's alleged delay in negotiating the CSA in the fall of 1998 was reasonable. Trinity was concerned that True North had quality control problems with its manufacturing that caused the replacement of many parts on the Gen I railcars. In October 1998, Buchanan met in Arizona with True North representatives, where they learned that True North had sold its non-rail business and hired a new general manager to improve operations at its New Castle facility, Vincent Poleo. He testified that he was glad Trinity had sold its non-rail businesses and could focus on railcar construction, but Trinity did not require the sale as a condition of negotiating the CSA. Trinity found these changes reassuring, but was still concerned with True North's ability to manufacture quality carbodies. For this reason, Buchanan recommended a milestone schedule of conditional carbody orders for the CSA, so that orders for larger numbers of carbodies would not become firm until True North had success-

fully produced the first 20 carbodies. Trinity also wanted the first 500 carbodies to have a fixed price, so that True North would bear the risk of increasing costs. On the subject of pricing, Buchanan testified that the 10% profit for True North was built into the pricing used in the CSA, but that the profit would vary depending on whether True North's estimated manufacturing costs were accurate.

### 4. Nick Matthews

Trinity's next witness was Nick Matthews. Matthews was an engineer assigned to Trinity's composite railcar program. Among his responsibilities was coordinating production of the railcar undercarriage at the New Castle facility. He testified that he had a meeting in late March or early April of 1999 at which True North divulged various cost overruns, including the overruns on tooling, volume pricing, and the secondary floor. Trinity agreed to pay for the tooling overrun because it would, under the CSA, own the tooling when the agreement was completed. True North took responsibility for the cost overrun caused by underestimates due to volume pricing, but refused to take responsibility for a volume overrun of $5,900 per carbody for the secondary floor. Matthews testified he participated in the June 15, 1999 teleconference and that Trinity never informed True North to stop working on the 68–foot project.

Matthews stated that he helped Trinity executives prepare for the July 7 meeting in Arizona, which he also attended. After being instructed to review the CSA "with a fine tooth comb," Matthews prepared an executive summary of its terms for Patrick Wallace in preparation for the meeting. Matthews remembered that at the July 7 meeting, Michael Ahearn declared True North would meet its commitment to build a secondary floor to the specifications required in the agreement. Matthews was unsure, however, who first mentioned the

2,000 p.s.i. standard. Trinity also agreed at that meeting to absorb an overrun of $319,000 for tooling costs. Following the meeting, Matthews prepared notes which he sent to Trinity on July 8. Matthews' notes state that "[w]e agreed to continue with building the 68–foot railcar" and that "[w]e agreed that True North would bear the cost of meeting all contract specifications for the secondary floor, including 2000 psi over a $1'' \times 7''$ area." Shortly after sending his summarized notes of their meeting to True North, Trinity received a letter, dated July 12, from True North disputing many of the points of agreement Matthews had described.

Following the July 7 meeting, Vincent Poleo of True North informed Matthews that the two month delay caused by switching from 68–foot to 72–foot railcars was caused by the tooling. It was Matthews' understanding that much of the tooling was being manufactured in a manner to make it useful for both sizes of carbody and that any change would therefore not affect the purchase of tooling. In fact, Matthews testified that he and Alan Henderson met with one of True North's tooling vendors in late June 1999 to ensure it was useful in production of 72–foot railcars. During his conversations with that vendor, Matthews concluded that much of the delay was caused by late changes to the tooling by True North and other manufacturing delays. Around the same time period Matthews visited the New Castle facility and was disappointed that True North was unable to produce engineering designs for the secondary floor. Thus, Matthews believed True North was using the delay in tooling to reconcile the fact that it was behind in its manufacturing schedule.

Matthews also acknowledged that Trinity received a letter dated July 16, 1999 from True North detailing four options for

continuing the railcar project. After evaluating the options, he recommended Trinity adopt option one but negotiate a $1,000 price decrease. Matthews could not explain why Patrick Wallace rejected this recommendation and decided to continue with the terms of the CSA.

Matthews stated he learned of the shutdown in late July or early August 1999 and that he immediately flew to New Castle and met with True North employees to resolve the problem. Among the employees with whom he met was Vincent Poleo, who told him he was disappointed True North had cancelled the project. While in Delaware, he instructed Trinity employees to continue to manufacture the 68–foot railcar platforms. Matthews testified that he continued to talk with Poleo over the next week, but received a call from Michael Ahearn of True North Partners instructing him to stop doing so. Matthews also stated that Trinity received bills for tooling after True North stopped operations and that he believed Trinity had not paid those bills. As of today, Matthews testified, Trinity had not received title to the tooling manufactured for the Gen II project.

### 5. *Jesse Collins*

Trinity's next witness was Jesse Collins, who was General Manager of Trinity's boxcar business unit and had a managerial role in the True North project. Collins testified that he frequently met with Vincent Poleo and Alan Henderson of True North in the spring of 1999 and they repeatedly told him that True North would not absorb the cost overrun on the secondary floor. He received a fax from Poleo on April 15, 1999 stating that because there was no agreement on the secondary floor and because the manufacture of tooling for the floor would require 20 to 24 weeks, the first three to five carbodies manufactured would not have secondary floors.

Collins testified that on the June 15, 1999 telephone call, the parties explored ways to come to agreement on the secondary floor and he thought that moving to a 72–foot railcar might offer an opportunity to recoup those extra costs. He stated that Trinity did not cancel the 68–foot railcar program on that call, but admitted stating that if the parties did not resolve their differences, they should explore shaking hands and walking away from the transaction. He admitted, however, that at the time he made that statement, he did not suggest how True North might recover its Learning Curve Costs and did not know Trinity had divested its non-railcar operations.

Collins testified that he was shocked by a letter he received after the June 15, 1999 meeting from True North's lawyers charging Trinity with an anticipatory breach by refusing to accept 68–foot railcars. Both he and Wallace responded within a few days with letters stating that Trinity intended to continue with the 68–foot railcar program.

Collins also attended the July 7, 1999 meeting in Arizona and testified it was Michael Ahearn who stated at that meeting that True North would stand by the 2,000 p.s.i. standard of the CSA.

### 6. *Patrick Wallace*

Trinity's next witness was Patrick Wallace, the President of Trinity's Freight Car Division. Wallace testified that he did not participate in the June 15 teleconference, but became concerned about it after Trinity received the letter from Michael Ahearn on June 22 in which True North stated that it was discontinuing work on the 68–foot carbody. He responded in a letter dated June 25 stating that Trinity had never wanted True North to discontinue work and that he was sending Steve Smith to Delaware to move forward with design

work on both the 68–foot and 72–foot boxcar projects. He admitted, however, that Trinity had no orders for the 68–foot railcar by the June 15th phone call and admitted that Burlington Northern, a significant customer, had stated it preferred the 72–foot railcar as early as March 1999.

Wallace also testified that he attended the July 7 meeting in Arizona. Because he was not involved in earlier discussions of the specifications, he learned of the 2,000 p.s.i. requirement for the first time on the plane while en route to the July 7 meeting in Arizona. Wallace testified that at the meeting the parties disputed whether the specifications of the secondary floor had been changed by Trinity. He testified that Steve Smith read the 2,000 p.s.i. standard from the CSA while the parties debated whether a change had been made. It was his recollection that the parties resolved the issue by agreeing that True North would meet the specifications for static loads and, if necessary, would pay any additional costs for increases in the dynamic load standards.

Wallace also testified about why he rejected the options proffered by Michael Ahearn of True North in July 1999. According to Wallace, option one, the option supported by Nick Matthews, would cost Trinity an additional $5,300 per railcar and increase the price of the first 500 railcars by more than $2.5 million. Furthermore, Matthews recommended that Trinity buy only 150 of the 68–foot railcars, and changing the quantity of railcars specified in the contract was likely to be complicated. He therefore rejected it and the other options. Instead, he stated in a letter to True North that Trinity would continue under the CSA, but he would meet with True North if necessary to discuss further options. In response, he received a letter from Michael Ahearn informing him that the New Castle facility was closing. Wallace testified he called Ahearn several

times afterwards and eventually received another letter on August 13 stating that True North would consider reopening, but Ahearn called a final time a few days later and announced that True North would try to recover its losses in court. In this final call, Wallace testified that he offered to have Trinity pay for the cost overruns to date if True North would agree to increase the number of cars sold at a fixed price from 500 to 800 to enable Trinity to recover its additional investment, but that Ahearn rejected this offer. On August 18, Trinity's lawyers sent a letter to True North stating that True North had 45 days to cure its breach of the CSA. That letter was followed by a letter from the same lawyer on August 23, just four days prior to the August 27 due date for the first composite railcars, stating that True North was not otherwise in compliance with the CSA and thus Trinity was terminating without giving True North opportunity to cure. On January 10, 2000, Trinity's counsel sent a third letter terminating the CSA.

### 7. *Michael Wagner*

Trinity's last witness was Michael Wagner, its damages expert. Wagner estimated Trinity's damages caused by True North's breach to be $2.3 million. He calculated this figure by summing the value of Trinity's investments at the leased space from True North in New Castle. Those assets included Trinity's investment in inventory, the value of Trinity's plant, property and equipment less depreciation, and the value of Trinity's jigs and fixtures, described as its specially-designed machinery for this production process. Wagner's total was $3,018,852. He then reduced that amount by the value of assets relating to the Gen I program and added back in the tax benefits of the depreciation. The final amount of damages was calculated to be $2,373,266 and the damages with pre-

judgment interest, calculated at the rate for 30–day Treasury Bills, was $2,582,876.

Wagner also criticized the damages calculation of True North's expert, Donald Pfingstler. Wagner agreed that Pfingstler properly calculated damages on the Learning Curve Costs, Tooling and Equipment Costs, and Closing Costs, but only if one assumed that True North properly terminated the CSA. Wagner then testified that the lost profits on carbodies 1–500 was actually zero. He stated Pfingstler wrongly assumed a 10% profit on the first 500 carbodies. Because the CSA was actually a fixed price contract, he explained, Pfingstler's damages calculation failed to account for many cost overruns that would have eliminated True North's profits, including the secondary floor overrun, and the volume pricing overrun.

Moreover, Wagner noted that True North's own data showed that, over the three years it was expected to take to produce the cars, True North would actually lose $677,000. On cross-examination, he admitted, however, that several of the True North financial records he relied upon were unsigned or undated. Furthermore, Wagner admitted that his calculations did not include the learning curve payments and that adding this amount to True North's financial projections increases its profits by approximately $10 million. Nonetheless, his opinion was that True North was entitled to no damages for lost profits on the first 500 carbodies.

Wagner also testified that Pfingstler's calculation of lost profits on carbodies 501–2,000 was inaccurate because it wrongly assumed that Trinity would continue purchasing carbodies under the CSA. In Wagner's opinion, this was unlikely both because True North experienced substantial cost overruns that would make the railcar prohibitively expensive and because Pfingstler's estimate of $92,000 for a 72–foot car was an unreasonable price. More-

over, Wagner noted that True North had not shown it could produce two Gen II carbodies a day, which was an assumption of Pfingstler's calculation. Wagner opined that True North's lost profits on carbodies 501–2,000 should therefore be zero because Trinity was not obligated to purchase these carbodies and, given the cost overruns, it was unlikely to do so.

Wagner also attacked Pfingstler's diminution in business value calculation. He argued that the assumption that True North could produce carbodies at a 10% or 6.5% profit level forever was untenable and had no evidentiary support. Thus, he opined that such damages were too speculative to award.

### E. *The Jury's Verdict*

At trial, Trinity suggested a jury instruction and verdict form consistent with its position that True North's damages were limited by the UCC. In a colloquy with the parties on May 10, 2001, the court rejected Trinity's requested instruction and verdict form, noting that it considered the CSA to be predominately a contract for services and not goods. The parties eventually reached agreement on a verdict form that divided the damages claims into various components, although Trinity preserved various objections to the jury instruction.

On May 14, 2001, the jury found that True North had proven, by a preponderance of the evidence, that Trinity breached the CSA. It awarded damages for lost profits on the first 500 carbodies of $4,143,641.29, but awarded no damages for carbodies 501–2,000. It also awarded $6,425,000 for True North's diminution in business value, $484,334 for unreimbursed Tooling and Equipment Costs, $3,226,770 for unreimbursed Learning Curve Costs, and $302,965 for Closure Costs, for a total of $14,582,710.29. The jury also found

Trinity breached its duty of good faith and fair dealing and awarded damages of $241,107. On Trinity's counterclaims, the jury found that Trinity did not prove by a preponderance of the evidence that True North breached the CSA or its duty of good faith and fair dealing. On May 16, 2001, the court entered judgment in favor of True North and against Trinity in the amount of $14,823,817.29.

### F. Post–Trial Motions

On May 29, 2001, True North submitted a motion to enter judgment on the remaining requests for declaratory relief. Its motion seeks three declarations from Count VI of its Complaint. Those declarations include that: (1) True North has the right of first refusal to satisfy Trinity's demands to manufacture a composite railcar using technology other than SCRIMP through December 31, 2010; (2) True North has the exclusive right to provide all of Trinity's requirements for railcars using the SCRIMP process and Trinity shall not manufacture or sell product using the SCRIMP process other than by agreement with True North; and (3) Trinity is obligated to refrain from disclosing True North's confidential information to third parties without the prior written authorization of True North.

On May 30, 2001, Trinity renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 and moved for a new trial and/or to alter or amend the judgment pursuant to Rule 59. Trinity seeks a new trial on four different bases. It argues that: (1) the court erroneously admitted parol evidence regarding the CSA and evidence concerning the Zoltek transaction that was both irrelevant and prejudicial; (2) the court gave an erroneous instructions to the jury on topics such as parol evidence, the damages properly available under the Uniform Commercial Code (U.C.C.), the duty of good faith and fair dealing, and the

recovery of Tooling and Equipment Costs and Learning Curve Costs; (3) the jury's finding of Trinity's liability and award of damages were against the great weight of the evidence; (4) and that the damages awarded were excessive and unjust.

Trinity argues in its motion for judgment as a matter of law that True North is not entitled to damages, as awarded by the jury, for the reduction of its business value, closure costs, lost profits, and the unreimbursed Tooling and Equipment Costs and Learning Curve Costs because these damages are either barred by the U.C.C. or speculative. Moreover, Trinity contends True North is not entitled to damages for breaching the duty of good faith and fair dealing and that the recovery of these damages in addition to the other damages for the breach is an impermissible double recovery. For these reasons, Trinity submits that True North can receive no damages as a matter of law.

### II. TRINITY'S MOTIONS

### A. Trinity's Motion for a New Trial And/Or to Alter or Amend the Judgment

Federal Rule of Civil Procedure 59 provides that a court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). The Third Circuit has instructed that "[t]he decision to grant or deny a new trial is confided almost entirely to the discretion of the district court." *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir.1992) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)).

In evaluating when to exercise this discretion, the court must consider on what basis the litigant seeks a new trial.

Should a party request a new trial because the jury's verdict was against the great weight of the evidence, the court must evaluate that motion circumspectly. As the Third Circuit has stated:

> When the district court grants a motion for a new trial based on the weight of the evidence, the court has: "to some extent at least, substituted [its] judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts."

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir.1991) (citing *Lind v. Schenley Indus. Inc.*, 278 F.2d 79, 90 (3d Cir.1960)). For this reason, "the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993); *see also Sheridan v. E.I. DuPont de Nemours & Co.* 100 F.3d 1061, 1076 (3d Cir.1996) (same). In contrast, if the court has committed a prejudicial error of law, it has wide discretion to require a new trial to correct that error. *Id.* at 1289–90.

■ In evaluating the movant's entitlement to a new trial following the jury's verdict, the court must "view the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979).

*1. Did the court err in admitting parol evidence and improperly instructing the jury on its import?*

Trinity's motion seeks a new trial on the basis that the court erred in admitting parol evidence and then improperly in-structed the jury as to its import. Trinity argues that the CSA is clear on its face and that neither party contended at trial that the CSA suffered from any ambiguity. Furthermore, both parties acknowledge that the CSA contains an integration clause that states the CSA "embodies the entire agreement and understanding between the parties relative to the subject matter hereof." On this basis, Trinity argues that it was improper for the court to admit three classes of testimony: (i) testimony from True North witnesses that the CSA entitled it to a 10% profit margin on the first 500 carbodies; (ii) testimony from True North that it was automatically entitled to an increase in the fixed purchase price for the first 500 carbodies to preserve its 10% profit margin; and (iii) testimony that Trinity was obligated to purchase 2,000 carbodies under the CSA from True North, rather than just 500. Because the court admitted this testimony and failed to give the curative instruction requested by Trinity, Trinity submits it is entitled to a new trial.

True North contends that the court did not err in admitting the contested testimony because the witnesses did not vary or contradict the terms of the CSA. Rather, True North argues that both its witnesses and those of Trinity introduced evidence to provide background to understand the CSA's provisions and context for the claims of bad faith.

■ The parol evidence rule requires the court to exclude "extraneous evidence that varies or contradicts the terms of a unified written instrument." *Mapsco, Inc. v. Rapid Distribution Serv., Inc.*, 509 A.2d 94 (table), 1986 WL 16788, *1 (Del.1986). There is no dispute that the CSA is a unified written instrument; the issue of contention is whether the testimony introduced at trial varies or contradicts the CSA's terms.

Trinity alleges that True North witnesses Michael Ahearn and Michael Pierce testified that True North was entitled to a 10% profit margin on the first 500 carbodies, while the CSA provided for a fixed price over the first 500 carbodies and only became a cost plus profit contract for carbodies 501 through 2,000. This allegation is not, however, supported by the record. Both Ahearn and Pierce testified that True North, when negotiating the CSA, intended to use a pricing model, attached as Annex B to the CSA, that would yield it a 10% profit for the first 500 carbodies. Neither testified, however, as suggested by Trinity, that the CSA guaranteed True North profits of 10%. Indeed, both testified at length about the need to control the cost of the carbody to meet its estimates and both discussed, at length, how certain design changes would require it to decrease its profit margin to 5% or lower. Thus, Ahearn and Pierce's testimony about True North's intent to profit from the first 500 carbodies at a rate of 10% does not vary or contradict that the CSA sets fixed prices.

Second, Trinity contends Ahearn testified that any increase in the cost of the carbody for which Trinity had input would result in an increase of the fixed price to preserve True North's profit margin. It argues this testimony contradicts Section 1.5 of the CSA, which provides only that True North and Trinity must negotiate in good faith any modifications to the carbody requested by Trinity that have an adverse financial effect on True North. Ahearn's testimony, however, is not as clear as Trinity posits. He did testify that, under Section 1.5, if Trinity wanted changes to the specifications to meet its customers' needs, True North "would have the right to any—an adjustment if it would cause an adverse financial impact or affect the production schedule," but he also stated in the next sentence that "we agreed to negotiate in good faith, et cetera, you

know, as these things came up and just try to work together on them." Ahearn Test., R. at 455:5–12. And just a few questions earlier, when asked "[w]hat happens if there's a need to modify the—or one party requests a modification of the specifications," he answered "the first thing is that it requires the consent of both parties. You can't—we agree that it wouldn't be fair if either party could force a modification on the other, so we'd have to work together on that and both agree." This testimony is consistent with Section 1.5 of the CSA, which states that "[i]f any requested modification would have an adverse financial impact on [True North] or would adversely affect the production schedule for Carbodies, [True North] and Trinity will negotiate in good faith such amendments to this Agreement as are necessary and acceptable to the parties to accommodate the requested the modifications." Thus, the parol evidence rule did not require exclusion of Ahearn's testimony.

Third, Trinity contends that True North witnesses Ahearn, Pierce, and Donald Pfingstler all testified that the CSA was a contract for the purchase of 2,000 carbodies, and not a contract for an initial conditional order of 500 carbodies with provisions addressing further orders should Trinity desire to continue the relationship. Once again, Trinity has misconstrued the nature of the testimony at trial. Ahearn, Pierce, and Pfingstler only testified that the CSA "contemplated" production of 2,000 railcars and all testified that the "initial order" under the Agreement was for only 500 railcars. This testimony is consistent with the CSA, which sets prices for 2,000 carbodies in Section 2.2, but states that Trinity's initial, conditional order, is only for 500 carbodies. Thus, none of the testimony of which Trinity complains contradicts or varies the CSA

and therefore need not have been excised from the jury's consideration. Furthermore, the jury understood this facet of the CSA; it only awarded True North lost profits on the first 500 carbodies to remedy Trinity's breach.

 Having found that the testimony of True North's witnesses did not require invocation of the parol evidence rule, the court does not agree with Trinity that it was required to give to the jury Trinity's proposed instruction to cure the alleged error. Thus, Trinity is not entitled to a new trial on this ground.

2. *Did the court err in admitting evidence of the parties' business relationship prior to entering the CSA?*

Trinity also seeks a new trial on the basis that the court erroneously admitted irrelevant and prejudicial evidence of the parties' business dealings prior to entering the CSA. Specifically, Trinity points to evidence such as: (1) the parties' conduct under the Preferred Supplier Agreement; (2) Trinity's 1998 lawsuit against Zoltek; (3) the termination of George Tunis as president of HDC; (4) True North's investment to acquire the interests of Du-Pont and Tunis in HDC; (5) the sale of True North's non-rail business units; and (6) True North's allegedly precarious financial condition. It contends the introduction of evidence on these topics was irrelevant to a determination of which party breached the CSA, prejudiced the jury against Trinity, and confused the jury as to which issues were in dispute.

In response, True North argues that these classes of evidence explain the parties' course of dealing and such evidence is relevant to the breach of the duty of good faith and fair dealing. Moreover, True North notes that Trinity introduced evidence at trial on many of these same subjects.

Trinity's brief does not set forth the legal authority on which it relies in seeking a new trial on the basis that this evidence should not be admitted. Presumably, Trinity seeks to exclude the evidence as irrelevant under Federal Rule of Evidence 401. Yet because the admission of irrelevant evidence is itself insufficient to entitle Trinity to a new trial under the harmless error standard of Federal Rule of Civil Procedure 61, Trinity must also argue that the irrelevant evidence was so prejudicial as to substantially influence the jury. *See* Fed.R.Civ.P. 61; *Ricketts v. City of Hartford,* 74 F.3d 1397, 1412 (2d Cir.1996) (noting that, under Fed.R.Evid. 103(a), error may not be predicated on the admission of evidence unless the substantial rights of the party are affected).

 True North argues that the evidence cited by Trinity is all relevant to the breach of the duty of good faith and fair dealing. The court agrees. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. In this case, evidence concerning the Preferred Supplier Agreement, Trinity's 1998 lawsuit against Zoltek, and the termination of George Tunis as president of HDC is helpful in understanding the relationship between HDC and Trinity and why the parties sought to enter the CSA. Such evidence is relevant to whether Trinity breached the implied covenant of good faith and fair dealing because "[t]he parties' reasonable expectations at the time of contract formation determine the reasonableness of the challenged conduct." *Continental Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1234 (Del. Ch.2000); *see also* Restatement (Second) of Contracts § 205, cmt. a ("Good faith performance or enforcement of a contract

emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."). The remaining categories of evidence, including True North's investment to acquire the interests of DuPont and Tunis in HDC, the sale of True North's non-rail business units, and True North's allegedly precarious financial condition, is all relevant to the course of dealings between True North and Trinity and the latter's breach of good faith and fair dealing. The investment by True North Partners in HDC and True North's financial condition both illuminate True North's interests and expectations in entering the CSA. Moreover, the sale of True North's non-rail business units, and Trinity's awareness of that action, was necessary to explain why True North sought to recover the diminution in its business value as a class of consequential damages stemming from Trinity's breach.

 Even if such evidence was irrelevant, however, Trinity is not entitled to a new trial simply without explaining why such evidence is prejudicial. Trinity has not explained how it was prejudiced by evidence about the Preferred Supplier Agreement or True North's eventual dismissal of George Tunis. Indeed, the evidence on these topics tended to show that HDC, True North's predecessor, had manufacturing difficulties and its president was widely disliked. Nor did evidence of the 1998 Zoltek litigation prejudice Trinity. While that evidence might make Trinity appear predisposed to bad faith litigation, it was admitted at trial that both Trinity and True North had brought suits to enjoin potential transactions that they thought might endanger their intellectual property. Thus, it is difficult to understand how such evidence might make Trinity, the defendant in this action, appear more likely to undertake bad faith litigation. Finally, evidence concerning True North's investment in HDC, its sale of the

non-rail business units, and its financial condition explains how True North came to contract with Trinity. Trinity has not explained why this evidence relating to True North was prejudicial to it.

The categories of evidence identified by Trinity were relevant and did not prejudice Trinity to an extent that would entitle it to a new trial. Thus, the court will not grant Trinity a new trial on the basis it admitted testimony of the parties' prior business dealings.

3. *Did the court err in instructing the jury on the duty of good faith and fair dealing?*

 At trial, the court delivered the following instruction explaining the good faith and fair dealing claims brought by both parties.

Delaware law imposes a duty of good faith and fair dealing in every contract. This duty is a contract term implied by courts to prevent one party from unfairly taking advantage of the other party. This duty includes a requirement that a party avoid hindering or preventing . . . the other party's performance.

The implied covenant of good faith and fair dealing emphasizes faithfulness to an agreed common purpose and consistency for the justified expectations of the other party. The parties' reasonable expectations at the time of the contract formation determines the reasonableness of the challenged conduct. A violation of the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct.

A duty of good faith and fair dealing is imposed on every contract.

R. at 1649:5–20. Trinity requested a proposed instruction that would have stated that "the claimant must prove that the other party acted in bad faith" and gone on to further explain bad faith. Trinity's

proposed instruction explained that "[t]he term 'bad faith' is not simply bad judgment or negligence, but rather implies the conscious doing of a wrong because of a dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." Trinity believes its instruction to be supported by *Continental Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del.Ch.2000), in which the Court of Chancery stated that "a claimant must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation in order to prove a breach of the implied covenant." Trinity argues that the court's failure to give its proposed instruction explaining the bad faith requirement was in error and requires a new trial.

The court finds that its instruction was consonant with Delaware law and therefore not in error. Particularly, the instruction tracks the language of § 205(a) of the Restatement (Second) of Contracts (1979), which has been used by Delaware courts to explain the duty of good faith. *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del.1996). While Trinity preferred a different recitation of this standard, it has not identified how the court's instruction departs from, or incompletely portrays, Delaware law. Moreover, Trinity has not shown support for why True North's proof of a breach of the duty of good faith is inadequate without further proof of bad faith.

 Furthermore, the court has concluded, *infra* at 528–29, that the jury's award of damages for Trinity's breach of the implied duty of good faith and fair dealing is duplicative of the remedy the jury afforded for Trinity's breach of the CSA's express provisions. Given this disposition of the jury's damage award, Trinity's claim that the court erroneously instructed the jury on the duty of good faith

and fair dealing is harmless and therefore cannot form the basis for a new trial under Federal Rule of Civil Procedure 61. *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 121–22 (3d Cir.1999) (improper jury instruction can be harmless error).

### 4. *Was the jury's verdict for True North supported by the weight of the evidence?*

Trinity argues that the jury's verdict that True North breached the CSA is against the great weight of the evidence and therefore it is entitled to a new trial. True North alleged two breaches of contract by Trinity; Trinity's demand that the carbodies have a secondary floor with a static load requirement of 2,000 p.s.i. and Trinity's order during the June 15 telephone conference to stop work on the 68–foot carbody and begin work on the 72–foot carbody. With respect to the 2,000 p.s.i. requirement, Trinity argues that the jury's verdict is unsupported because the testimony at trial established that: (1) Alan Henderson admitted he mistakenly included the 2,000 p.s.i. requirement in the Preliminary Specification; (2) Trinity employee Dilip Niak agreed to a lower 714 p.s.i. load standard together with True North's John Murphy in February 1999; (3) Trinity's Steve Smith suggested further reducing the static load requirement to 600 p.s.i. in July 1999; (4) Trinity's Al Norton offered to continue to reduce the load requirements for the secondary floor in July 1999. According to Trinity, this testimony establishes that, contrary to True North's claim, it never required True North to meet a 2,000 p.s.i. static load requirement.

Trinity also argues that the jury could not have found a breach of the CSA based on True North's allegation that Trinity ordered it to stop work on the 68–foot car during the June 15 teleconference. While Trinity admits that there was conflicting

evidence on what was said during the teleconference, it points to the following evidence that it believes demonstrates that it could not have breached: (1) Steve Smith's notes from the teleconference support Trinity's account of the conversation; (2) Smith's notes from the week he spent in New Castle following the June 15 teleconference show that he discussed the 68–foot carbody at length with True North employees; (3) Smith testified that Trinity attempted to sign a lease with Burlington Northern for the 68–foot railcar after June 15th; (4) Nick Matthews testified that Trinity never stopped production of 68–foot underframes for the carbodies of that length. Furthermore, Trinity argues that even if the jury credited True North's account of the June 15 teleconference, the evidence at trial demonstrated that both Patrick Wallace and Jesse Collins attempted to cure the alleged error by sending True North letters debating what occurred on the call and asking True North to resume 68–foot carbody production.

In response, True North submits that there is conflicting evidence on both breaches of the CSA, but argues that the jury's finding that Trinity breached was supported by substantial evidence. Further, True North contends that its evidence supporting both breaches by Trinity is substantial. In particular, it notes that both Alan Henderson and Michael Ahearn testified that Trinity sought to increase the secondary floor static load requirements at the July 7 meeting. With respect to the June 15 teleconference, True North argues that the jury must have believed the testimony of its witnesses that Trinity did indeed order True North to stop production on the 68–foot railcar and shift into work on a 72–foot railcar.

 Trinity must satisfy a lofty standard to show that the jury's verdict was against the weight of the evidence. A district court may grant a new trial on this basis "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the court's] conscience." *Williamson,* 926 F.2d at 1353. Furthermore, the court is required to "view all the evidence and inferences reasonably drawn therefrom in the light most favorable to the party with the verdict." *Chuy,* 595 F.2d at 1273. From this perspective, the court finds that there was sufficient evidence for a jury to reasonably conclude that Trinity breached the CSA either by demanding the 2,000 p.s.i. static load standard or by ordering True North to stop production on the 68–foot railcar.

 Beginning with the secondary floor, the jury heard testimony from Alan Henderson and others that the 2,000 p.s.i. standard was not discussed by the Joint Panelization team, was not intended by True North to be part of the Preliminary Specification, and that Trinity did not enforce that standard until it did so at the July 7, 1999 meeting. Viewing this evidence in the light most favorable to True North, the jury could have reasonably concluded that the 2,000 p.s.i. standard was not a part of the parties' contract and Trinity's imposition of that standard at the July 7 meeting and afterwards was a violation of the CSA's requirement in section 1.5 that the parties "negotiate in good faith such amendments to this Agreement as are necessary and acceptable to the parties...."

 Furthermore, True North argued that Trinity repudiated its commitment to purchase 500 68–foot carbodies, as required by section 1.3 of the CSA. The jury heard evidence at trial that the market for 72–foot railcars was stronger than for 68–foot, that the Joint Panelization Team developed a 72–foot railcar, that Trinity had no orders for a 68–foot railcar as of June

15, 1998, and that Trinity informed True North to stop work on the 68–foot carbodies on a June 15, 1999 conference call. Taking this evidence in the light most favorable to True North, the jury could thus rationally conclude that Trinity repudiated its obligations under the CSA at that time. Moreover, while Trinity maintains that letters from Patrick Wallace and Duncan Gillies cured this breach, it was the province of the jury to find such a cure inadequate. The jury heard testimony that Trinity never furnished True North with information on proposed customers for a 68–foot railcar, that True North experienced significant delays from the switch, and that Trinity and True North remained apart on significant design issues, including the load requirements for the secondary floor, as late as the July 7, 1999 meeting.

The court therefore concludes that the jury's verdict was not against the great weight of evidence presented at trial. Its conclusion that Trinity breached the CSA is not a miscarriage of justice and is not a shock to the conscience. *See Williamson*, 926 F.2d at 1353.

### 5. *Was the jury's award of damages to True North excessive?*

Trinity's argument that the jury's award of damages to True North is excessive is a reprise of its arguments made in its motion for judgment as a matter of law; including the arguments that various categories of damages are speculative, barred by the U.C.C., and not supported by the evidence. Compounding these alleged errors, Trinity argues the jury's award is grossly excessive and shocks the conscience.

The court disagrees that the jury's award of damages in this case is excessive or shocks the conscience. The damages awarded by the jury were compensatory and consistent with, and supported by, True North's damages request.

The jury's award indicates that it was not swayed by excessive emotion in awarding damages, for it denied True North lost profits on carbodies 501–2,000 and awarded it less than it requested for both lost profits on the first 500 carbodies and for True North's diminution in business value. Thus, the court will not set aside the jury's award of damages on the basis that it is excessive.

### B. *Trinity's Motion for Judgment as a Matter of Law*

In Trinity's motion for judgment as a matter of law, it argues True North is not entitled to damages, as awarded by the jury, for the reduction of its business value, closure costs, lost profits, and contractual damages for unreimbursed Tooling and Equipment Costs and Learning Curve Costs. Thus, Trinity argues that even if the verdict is upheld, True North cannot recover damages.

A district court may overturn a jury's verdict on a motion for judgment as a matter of law only if "there is no legally sufficient evidentiary basis for a reasonable jury" to have returned the verdict it did. Fed.R.Civ.P. 50(a). In evaluating the jury's verdict, the court must view all evidence in the light most favorable to the party opposing the motion, True North. *Rego v. ARC Water Treatment Co. of Pa.*, 181 F.3d 396, 400 (3d Cir.1999). "The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury." *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 691 (3d Cir.1993). Instead, the court's task is to determine "whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" *Id.* (citing *Keith v. Truck Stops Corp. of America*, 909 F.2d 743, 745 (3d Cir.1990)).

1. *Is True North entitled to damages for "Diminution or Reduction of Business Value"?*

Trinity presents two arguments challenging the jury's award of $6,425,000 to True North for the diminution or reduction of its business value. It argues that, as a matter of law, the jury cannot award damages on this theory because Article 2 of the U.C.C., as adopted in Delaware, applies to the CSA and it does not provide for the award of consequential damages. Along the same lines, Trinity argues the court erred by refusing to give Trinity's proposed instruction setting forth the proper recovery of damages under Article II. Second, it argues the evidence presented to the jury is legally and factually insufficient to support the jury's award.

a. *Does the U.C.C. apply to the CSA?*

The damages to which True North is entitled for breach of contract under Delaware law ordinarily include "damages for breach and those consequential damages that were reasonably foreseeable at the time the contract was made." *Pierce v. Int'l Ins. Co. of Illinois,* 671 A.2d 1361, 1368 (Del.1996). In contrast, contractual damages under the U.C.C. include only "[t]he remedies ... to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages ...." 6 Del C. § 1–106(1). True North does not dispute that "diminution in business value" is a type of "consequential damages" and therefore may not be awarded under the U.C.C. Trinity does not dispute that the damages awarded for "diminution in business value" were reasonably foreseeable, given the exclusivity of the parties' relationship, at the time the CSA was entered and therefore properly awarded if Delaware's common law of contract applies. The only question presented by the parties is which law applies—the U.C.C. or the common law—to the CSA.

The U.C.C. only applies to "transaction[s] in goods." 6 Del. C. § 2–102. "Goods" are defined by the U.C.C. as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) in action." 6 Del. C. § 2–105(1). The court agrees that the carbodies produced by True North for Trinity are "specially manufactured goods" that were "movable at the time of identification to the contract for sale" and therefore meet the definition of "goods" contained in the U.C.C. The court's inquiry, however, does not end there. "When a contract is solely for the sale of goods or for services alone, the applicability or inapplicability of the U.C.C. is clear. However, a problem arises in the instance of a mixed contract for both goods and services." *Glover Sch. & Office Equip. Co. v. Dave Hall, Inc.,* 372 A.2d 221, 223 (Del.Super.Ct.1977). Because performance of the CSA requires more than simply the production of goods, it is a mixed contract for goods and services and therefore presents the problem identified in *Glover.* As the court in *Glover* explained, "[w]here a mixed contract is involved, it is necessary that the Court review the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract to determine whether the contract is predominantly or primarily a contract for sale of goods or for services." *Id.* at 223. Thus, the court must determine which facet of the CSA, the sale of goods or the furnishing of services, predominates in the CSA.

Trinity argues that the CSA is a contract for the sale of goods because it requires the sale of 500 carbodies from True

North to Trinity at a fixed price. It notes that the CSA contains language explaining that it "shall not create, nor be deemed, a partnership or joint venture between the parties" and that Delaware law recognizes such statements to evidence simply an arms-length commercial transaction. *See IM2 Merchandising & Mfg., Inc. v. Tirex Corp.*, Civ. A. 18077, 2000 WL 1664168, *6 n. 21 (Del.Ch. Nov.2, 2000) (noting that contract terms disclaiming any joint venture or partnership evidenced the absence of a fiduciary relationship between contracting parties). But whether the court chooses to characterize the CSA as a partnership, joint venture, or simply an arms-length commercial transaction has no bearing on whether the CSA is predominantly a contract for goods or services.

Instead, the court must look to the performance undertaken by True North and Trinity pursuant to the CSA. The court finds a number of mutual obligations that demonstrate the CSA is predominantly a contract for services. First, under the CSA True North was required to design a new product, a composite carbody, to unsettled and changing specifications set by Trinity. As evidenced by the testimony at trial relating to the challenges in designing this new product and establishing True North's considerable expense to do so, the design of the carbody was a substantial component of the CSA. Indeed, the CSA contained a number of provisions detailing the parties' respective responsibilities for creating the carbody design to Trinity's specifications.

Second, True North did not simply design a custom or specialized good for Trinity, it also designed and built the production process itself, including the tooling and equipment at the New Castle facility. Were this simply a contract for the sale of goods, Trinity would have only compensated True North for the purchase of the carbodies. However, Trinity reimbursed True North pursuant to § 4.2 of the CSA for all Tooling and Equipment Costs, and paid, as an additional premium above the price of the railcar, for all of True North's Learning Curve Costs. These payments show that the CSA was not merely a goods contract, but that the design and construction of the novel production process was a significant component of the parties' mutual obligations. Indeed, upon payment of the Tooling and Equipment Costs and the Learning Curve Costs, True North was required to give title to the tooling and equipment to Trinity and safeguard such tooling and equipment at its New Castle facility.

Third, a number of other obligations support the conclusion that the CSA was predominantly a contract for services. For example, True North was responsible for more than just producing the carbody, but also had to receive underframes supplied by Trinity and perform the service of attaching the carbodies to those frames. True North agreed to continue to lease land to Trinity for the latter to produce those underframes. True North and Trinity even agreed to divide profits from their endeavor under § 2.3 of the CSA, thereby demonstrating that the CSA was predominantly a contract for services.

For the foregoing reasons, the court concludes that the CSA is a mixed contract for goods and services and that, among those two classes of obligations, services predominate. *See Glover Sch. & Office Equip.*, 372 A.2d at 223 (contract for the provision and installation of school lockers was a mixed contract and the trial court properly found services to predominate); *Wharton Mgmt. Group v. Sigma Consultants, Inc.*, 1990 WL 18360, *3 (Del.Super.Ct. Jan.29, 1990) (contract to design, develop, and install computer system was a predominantly services contract, even though a tangible end product was pro-

duced). The cases proffered by Trinity are not to the contrary. Trinity relies chiefly upon *Micro Data Base Sys., Inc., v. Dharma Sys., Inc.*, 148 F.3d 649, 655 (7th Cir.1998), in which the court found the creation of a customized software program from a basic program, under New Hampshire law, was a contract for the sale of goods and not a service. Delaware law is the same. *See also Neilson Bus. Equip. Ctr., Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del.1987) (customized computer system for medical billing was a contract for the sale of goods). However, the CSA is distinguishable. True North's obligations to Trinity were not simply to customize an already existing product for Trinity's use, but to work with Trinity to create, design and build an entirely new carbody and carbody production system, funded by Trinity, and then incorporate Trinity's undercarriage to create a railcar for Trinity to sell. Thus, the CSA imparted to True North a significantly greater burden to provide services than did the sellers of customized software in either *Micro Data Base Systems* or *Neilson Business Equipment Center*.

▮▮▮▮▮▮ Finally, the court will address an argument raised by Trinity for the first time in its reply brief.[2] Trinity argues that True North made a binding judicial admission in Count IV of its complaint when it, while arguing that Trinity violated the duty of good faith and fair dealing in the U.C.C., stated that the "Agreement is for the sale of goods by [True North] to Trinity." Even were the court to find a judicial admission, the truth of this statement is uncontested. One of the obligations of the CSA is the sale of goods by True North to Trinity. The relevant question in determining the applicability of the U.C.C. is whether that is the predominant obligation. Thus, to the extent that the

statement is one of fact, it is a judicial admission, albeit an unimportant one. Trinity's argument, however, is that True North's complaint makes this factual statement in the context of seeking relief under the duty of good faith and fair dealing in the U.C.C. and therefore has admitted the applicability of the U.C.C. The court disagrees. "Judicial admissions which are binding on the tendering party are limited to factual matters in issue and not to statements of legal theories or conceptions." *Blinder, Robinson & Co. v. Bruton*, 552 A.2d 466, 474 (Del.1989). True North's improvident invocation of the duty of good faith and fair dealing in the U.C.C., and not in Delaware common law, does not create a judicial admission that the U.C.C. applies.

Thus, the court concludes the U.C.C., and its restriction on the award of consequential damages, is inapplicable and Trinity is not entitled to judgment as a matter of law on the "diminution of business value" jury award. Nor does the court believe it erred in refusing to give Trinity's proposed instruction, which would have detailed the U.C.C.'s limitation on consequential damages.

b. *Is the award of "diminution of business value" damages speculative as a matter of law?*

Trinity's second argument is that the "diminution of business value" award represents True North's lost profits beyond those provided in the CSA and are therefore speculative and not properly awarded under Delaware law. Its position is premised on the "general rule" that "evidence of expected profits from a new business is too speculative, uncertain and remote to be considered where there is no history of prior profits." *Re v. Gannett Co.*, 480 A.2d

**2.** In response to this argument, True North filed a surreply brief and a motion for leave to

file the same. The court will grant True North's motion.

662, 668 (Del.Super.Ct.1984). As evidence that "general rule" should apply in this case, Trinity points out that True North had never shown a profit, could not demonstrate an ability to produce composite railcars, and had never shown an ability to produce carbodies at a rate of 500 per year, as assumed by True North's damages expert, Donald Pfingstler.

In response, True North argues that the jury's award of $6,425,000 for its "diminution of business value" does not represent lost profits. Rather, the damages represent True North's value as a going concern at the time it shut down operations due to Trinity's breach of the CSA. True North alternatively argues that even if the $6,425,000 award does represent lost profits, the jury's award was well-founded after consideration of Pfingstler's testimony and is therefore not speculative.

 True North is correct that the jury's award of the diminution in business value is not the same as lost profits per se. Rather, True North's damages expert testified that the diminution in business value was the value of the company at the time it closed due to Trinity's breach. This measure of damages was undoubtedly correct. As stated by one Delaware court, the "proper measure of damages for destruction of a business is not lost profits, but the difference between the value of the business before and after the defendant's wrongful acts." *Zaleski v. Mart Assocs.*, 1988 WL 77779, *1 (Del.Super.Ct. July 25, 1988) (citing 22 Am.Jur.2d, Damages § 636). However, because the company's profitability was an important component of Pfingstler's calculation of the company's value, the speculative nature of True North's lost profits remains a concern. While Pfingstler's estimation of the loss of business value took into account other variables, including assumptions about productive capacity, the value of True North's technology, and when the CSA would terminate, it is apparent that the value of True North as a going concern is closely related to its profitability.

 However, the fact that the "diminution in business value" damages are related to True North's ability to show future profits does not necessarily require a finding that those damages are speculative as a matter of law. Delaware law requires "that loss of future profits must be established by substantial evidence and can't be left to speculation." *Mobile Diagnostics, Inc. v. Lindell Radiology P.A.*, 1985 WL 189018, *4 (Del.Super.Ct. July 29, 1985). While "[l]ost profits on a new business may be too speculative to allow recovery if there is no evidence that the business would be profitable, .. recovery for lost profits is not denied merely because a business is newly established .... The Delaware courts have allowed lost profits for a business in existence only five months where it could be shown that a profit would have been realized." *Id.* (citing, *inter alia*, *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 394 A.2d 1160, 1164 (Del.1978) and Restatement (Second) of Contracts § 352 (1979)).

The evidence at trial showed that True North, and its predecessor HDC, had been in existence for several years. While it had lost money developing prototypes and the Gen I railcar, True North had entered into a contract to recover much of its initial investment and yielding profits on the first 500 carbodies and a guaranteed 10% profit margin on subsequent productions. Thus, while True North lacked profitability, it was not a new company and had a history of operations, including under the CSA, from which the jury could rationally conclude it had a likelihood of future success. True North's expert presented his opinion to that effect and concluded True North was likely to be worth from $13.7 million and $7 million, depend-

ing on when Trinity would have chosen to terminate the CSA, either after 500 or 2,000 carbodies. The jury's award of $6,425,000 in damages for the diminution of True North's business value indicates that the jury credited Pfingstler's testimony that True North was likely to have significant value as an ongoing concern, but reflects a healthy skepticism of either the productivity assumptions or profitability variables he incorporated into his testimony. In any event, the jury's award also indicates that it unequivocally rejected the testimony of Michael Wagner, Trinity's damages expert, that True North had no value as a going concern because it had not shown that it could produce a profitable composite railcar. Given these circumstances, the court concludes that the jury's award of damages to True North for its diminution in business value is not speculative as a matter of law.

### 2. *Is True North entitled to damages for its Closure Costs?*

The jury awarded True North $302,965 in closure costs. True North's damages expert, Donald Pfingstler, testified that this amount represented the severance pay True North had to pay its employees when it closed the New Castle facility in August 1999 and the amounts it has incurred since that time to store the tooling it created for the Gen II cars.

Trinity argues that it is entitled to judgment as a matter of a law that True North can receive no damages for its closure costs. It asserts, and True North does not contest, that such damages are consequential and therefore cannot be awarded under Article II of the U.C.C. Because the court has concluded that the CSA is predominantly a contract for the provision of services, the U.C.C.'s limitation on consequential damages is inapplicable and Trinity is not entitled to a take nothing judgment on this component of damages.

### 3. *Is True North entitled to damages for its lost profits for carbodies 1–500?*

■ The jury awarded damages in the amount of $4,143,641.29 to compensate True North for the lost profits it would have received on the first 500 carbodies produced under the CSA if Trinity had not breached. Trinity argues in its motion that this award is speculative as a matter of law because lost profits are measured by subtracting costs from revenues. Because True North's expert merely assumed a 10% profit margin on the first 500 carbodies, rather than actually calculating per carbody profits, Trinity argues the jury's award must be speculative. According to Trinity, True North could not have realized 10% in profits because its costs were significantly higher than it estimated. Moreover, Trinity points to evidence at trial that Michael Ahearn of True North Partners testified that he expected to break even after 500 carbodies and that internal True North financial records showed it was likely to lose money.

In response, True North argues that it was proper for the jury to credit Pfingstler's testimony True North would receive a 10% profit because section 1.5 of the CSA provided that True North did not have to accept Trinity design changes that would increase costs. While True North acknowledged that section 1.5 only applies to design changes and that any increased costs of meeting the original specification would erode profit margins, it argues the jury's verdict supports its theory of the case that the extra secondary floor costs associated with meeting a 2,000 p.s.i. standard were not intended to be part of the original specification. Moreover, True North argued that Pfingstler's damages estimate relied on the figures used by the parties in the CSA and notes he took

account of the cost overrun for which True North took responsibility.

■ "Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference." *Tanner v. Exxon Corp.*, No. 79C–JA–5, 1981 WL 191389, *2 (Del.Super.Ct. July 23, 1981) (citing Restatement (Second) of Contracts, § 331, Comment c). True North's evidence of its lost profits on the first 500 carbodies satisfies this standard. The jury obviously credited Pfingstler's testimony that True North would profit from its production of the first 500 carbodies. Pfingstler's damages estimate was based on the profit estimates contained in the CSA and took into account the cost overrun on volume pricing for which True North was responsible. While Trinity introduced contrary evidence, it is apparent the jury rejected that testimony. Pfingstler's testimony was reasonable and grounded in profit estimates made by the parties themselves. The existence of evidence to the contrary demonstrates only that the amount of damages was contested, not that it is speculative.

4. *Is True North entitled to damages for its Tooling and Equipment Costs and its Learning Curve Costs?*

■ The jury awarded True North $484,334 for its "Tooling and Equipment Costs" and $3,226,770 for its "Learning Curve Costs." These damages represented the total unreimbursed amount of these categories of payments detailed in sections 4.1 and 4.2 of the CSA. Under section 4.2 of the CSA, True North is only entitled to these damages if it properly terminated the Agreement. Trinity argues True North never proved to the jury that it properly terminated the CSA and that, in fact, the only evidence at trial proves that Trinity properly terminated. Thus, Trinity argues that it is entitled to judgment as a matter of law or, alternatively, that the

evidence was insufficient to support a judgment and that it should be entitled to a new trial. Trinity also argues that the court erred in failing to instruct the jury regarding the proper recovery of these damages.

True North argues that the jury found that it properly terminated the CSA and that such finding was a necessary component of its award of damages for these non-recurring costs. It notes that neither party disputes that the CSA was in fact terminated and that the jury found that Trinity breached, thus the jury could correctly conclude that it was entitled to its non-recurring costs pursuant to subsection (b) of section 10.3 of the CSA. That subsection states that True North may terminate the CSA "if Trinity defaults in the performance of any ... material obligation [other than the failure to pay any sum required to be paid to True North, which was governed by 10.3(a) ] under this Agreement and such default has continued uncured for a period of at least 45 days following the giving of written notice by True North to Trinity specifying such default." True North submits that a letter from its counsel, dated June 22, 1999, notified Trinity that it was in default of the CSA and that it terminated more than 45 days later on September 2, 1999.

Before True North can receive the value of its Learning Curve Costs and Tooling and Equipment Costs, section 10.3(b) of the CSA requires that Trinity default in the performance of a material obligation and that default continue uncured for 45 days following written notice. True North gave written notice of Trinity's default by letter dated June 22, 1999. While Trinity responded in the following days with letters announcing that it wished to continue with the 68–foot carbody, the two parties never concluded their negotiations of the carbody specifications nor provided the as-

surances True North requested that Trinity could sell the smaller railcar. Thus, the evidence, viewed in the light most favorable to True North, was sufficient for the jury to conclude that Trinity failed to cure its breach and that True North was entitled to recover its unreimbursed costs pursuant to section 10.3(b).

Nor does the court believe it erred in declining to give Trinity's requested instruction on this subject. Trinity's proposed instruction states:

[True North] has claimed that it is entitled to recover Non–Recurring Costs, which Section 4.1 of the Agreement [defines] as both Tooling and Equipment Costs and Learning Curve Costs. [True North] is not entitled to recover any Non–Recurring Costs unless you find that [True North] rather than Trinity first properly terminated the Agreement.

D.I. 159, Proposed Instruction 19A–2. Rather, the court instructed the jury that "[I]f you find that Trinity Industries breached the Carbodies Supply Agreement, True North is also entitled to recover its Non–Recurring Costs, which are defined to include Tooling and Equipment Costs and Learning Curve Costs under that Agreement." The distinction between the two is minor. Trinity's instruction recites the term of sections 10.3 and 10.4, while the court's instruction references the requirements of the Agreement generally. Moreover, the instructions were delivered prior to closing arguments, at which time Trinity's counsel extensively discussed the particular requirements of the agreement, Tx. at 1691–92, 1715. Thus, it is unlikely that the alleged lack of specificity in the court's verdict resulted in jury confusion as to the requirements of the CSA. The court therefore finds that the jury instruction on tooling and equipment costs is not in error and does not entitle Trinity to judgment as a matter of law or a new trial.

5. *Is True North entitled to damages for Trinity's breach of the implied duty of good faith and fair dealing?*

The jury awarded True North $241,107 for Trinity's breach of the implied duty of good faith and fair dealing. Trinity argues that this award represents an impermissible double recovery of contract damages for True North, with one recovery of damages for breach of the CSA and a second recovery for breach of the CSA's implied duty of good faith and fair dealing. In response, True North argues that its recovery of the good faith damages is a wholly separate claim, pled in the alternative to its breach of contract claim and supported by the evidence at trial.

As stated in the Restatement (Second) of Contracts, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1979). Delaware courts have enforced the duty of good faith and fair dealing as part of the decisional law of the state. *See E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 443 (Del.1996). Violation of the duty of good faith and fair dealing is a breach of contract, and thus, in the typical case, the damages properly awarded are concurrent with those awarded for a breach of the contract's explicit provisions. In *Pressman,* the Delaware Supreme Court addressed the damages properly awarded for the violation of the duty of good faith and fair dealing in an employment contract. In noted that "[h]istorically, damages for breach of contract have been limited to the non-breaching parties' expectation interest." *Id.* at 445. Thus, the court went on to find that a breach of the duty of good faith and fair dealing gave rise to neither punitive damages nor damages for emotional distress. *Id.; see also Pierce v. Int'l Ins. Co. of Ill.,* 671 A.2d 1361, 1367 (Del.

1996) (damages for emotional distress are not available for the violation of the duty of good faith in contract, but must be sought in tort law). Thus, the court concludes that only contractual damages can be awarded for Trinity's bad faith.

Trinity argues that because the breach of duty of good faith and fair dealing only gives rise to damages in contract, and because True North received all its contract damages on the breach of contract claims, True North is not entitled to additional damages for Trinity's bad faith. True North disagrees and maintains that its theory of damages under the duty of good faith and fair dealing are separate from its other contract damages. For example, it cites its evidence that Trinity filed an unfounded and frivolous lawsuit to obtain a temporary restraining order stopping True North's transaction with Zoltek. The Zoltek transaction, however, occurred roughly 7 months before the CSA was entered. Trinity's actions with respect to the Zoltek transaction cannot form the basis for breach of an implied covenant in a contract that does not yet exist.

Other than the Zoltek transaction, True North offers no evidentiary support for the jury's award of $241,107 in damages for the duty of good faith apart from the breach of the explicit terms of the contract. Because the jury found a breach of contract and awarded True North the full amount of contractual damages to which it was entitled, its separate finding that Trinity breached the duty of good faith is simply another part of Trinity's breach. Thus, damages for Trinity's breach of the duty of good faith are subsumed in the jury's award of contract damages generally and cannot support a separate, additional award. For this reason, the court will enter an order decreasing the judgment by $241,107.

## III. *TRUE NORTH'S MOTION*

True North seeks declaratory relief as requested by Count VI of its complaint. Specifically, True North wishes the court to declare its rights pursuant to various sections of the CSA, including:

(i) In the event that Trinity, through December 31, 2010, either on its own or with others, manufactures or has manufactured on its behalf insulated or refrigerated rail carbodies made of plastic composites utilizing technology other that SCRIMP, then True North must be provided the right of first refusal to satisfy Trinity's demands on the same terms and conditions under which Trinity would otherwise obtain the product;

(j) True North has the exclusive right, through December 31, 2010, to provide all of Trinity's requirements for any railcars that utilize the SCRIMP process and Trinity shall not engage directly or indirectly in the manufacture or sale of any products that utilize the SCRIMP process other than products manufactured under agreement with True North; and

(k) Trinity is obligated to refrain from disclosing any True North Confidential Information to third parties without the prior written authorization of True North.

The first two of these requests for declaratory relief are grounded in section 6.2, which details Trinity's exclusivity obligations to True North until December 31, 2010. Section 9.1(ii) requires that the parties not disclose "Confidential Information," as that term is defined in the Agreement, to any third party without prior written authorization during the term of the CSA and for five years after its termination. None of these provisions are implicated, however, unless True North properly terminated under section 10.3 of the

CSA. True North argues that because the jury found that Trinity breached the CSA and True North properly terminated, the court is bound by those fact and must therefore afford the requested declaratory relief.

Trinity argues in response that the court may not enter the requested declaratory judgment because the jury did not find that True North properly terminated the CSA and is therefore entitled to relief. Moreover, it argues that because True North proffered no evidence at trial that it properly terminated, the court cannot assume that fact from the jury's verdict. Finally, because Trinity has not threatened to violate one of True North's proposed declarations, the court should exercise its discretion and not grant the requested relief.

None of the parties dispute that the court is bound to the facts found by the jury, *see Andrews v. City of Phila.*, 895 F.2d 1469, 1483 (3d Cir.1990) ("in all issues which are common to a claim tried simultaneously to the bench and to a jury, the court is bound by the jury's findings"), but they do dispute what facts those are. Trinity notes that the jury made no express finding that True North properly terminated the CSA, but True North argues that the lack of an express finding is irrelevant if such a finding is necessary to the jury's verdict. *See Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 383 (1st Cir.1998) ("the presumptive rule is that the first factfinder binds the second on factual issues actually litigated and necessary to the result").

■ In this case, a finding that True North properly terminated the CSA was necessary to the jury's verdict. As noted above, the jury's grant of damages to True North for its non-recurring costs, such as Tooling and Equipment and Learning Curve Costs, was premised, under section 4.2 and 10.3 of the CSA, on True North's proper termination of the CSA. Trinity disagrees, however, and notes that section 4.2 provides three different bases for the reimbursement of non-recurring costs— delivery of the 2,000th carbody, True North's proper termination of the Agreement, or the lifting of True North's exclusivity restrictions. Trinity argues that because the court cannot be sure that the jury based its award on True North's proper termination, it is unwarranted to conclude that such a fact was necessary to the jury's verdict. The court disagrees. While it is true that section 4.2 provides three different scenarios for the immediate reimbursement of non-recurring costs, there are no facts on the record that True North either delivered 2,000 carbodies or ever had its exclusivity restrictions terminated. Because the jury could not have made a finding on which it had no evidence, the court must conclude that it granted damages for Tooling and Equipment and Learning Curve Costs because it agreed that True North terminated the agreement.

■ Last, Trinity argues that the court has broad discretion in granting or denying requests for declaratory relief and that such discretion should be exercised in this instance to deny relief until such time as circumstances require it. It posits that because Trinity has not threatened to violate the exclusivity provisions, any dispute regarding them is not ripe and would only invite future litigation.

■ The court is unconvinced that it should stay its hand based on the lack of ripeness of further dispute between the parties. The CSA affords the parties certain assurances beyond its termination, including the future enforcement of its exclusivity provisions. These covenants were bargained for in the CSA and avoidance of their application in the absence of a current controversy is inconsistent with

why parties enter contracts to begin with—to set forth the scope of mutual obligation between the parties before disputes arise. The court recognizes that the Declaratory Judgment Act, 28 U.S.C. § 2201, confers upon it considerable discretion and "[e]ven when declaratory actions are ripe, the Act only gives a court the power to make a declaration ... it does not *require* that the court exercise that power." *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646–47 (3d Cir.1990) (emphasis in original). Nonetheless, declaratory judgments are, by their nature, anticipatory of future injury and are issued despite that "this *ex ante* determination of rights exists in some tension with traditional notions of ripeness." *Id.* at 647 (emphasis in original). Moreover, while Trinity submits that it has not threatened to violate the exclusivity provisions to which it hopes to avoid being bound, it cannot argue the provisions have no import. Trinity began manufacturing the TrinCool, a partially-composite railcar, shortly after the demise of its relationship with True North. While the court lacks a factual basis from which to opine on the relevance of TrinCool to the requested declaratory judgment, it is nevertheless clear that Trinity intends to continue to operate in the marketplace for composite railcars and that True North's requested relief might therefore have application. Thus, the court grants True North's motion for declaratory relief and will enter the requested declaration when it grants final judgment.

## IV. *CONCLUSION*

For the foregoing reasons, the court will grant in part and deny in part Trinity's Renewed Motion for Judgment as a Matter of Law and its Motion for New Trial and/or to Alter or Amend the Judgment. The motion will be granted to the extent necessary to remedy the jury's award of duplicative damages for breach of both the express provisions of the CSA and its implied covenant of good faith and fair dealing. In all other respects, Trinity's motion will be denied.

The court will grant True North's motion to enter judgment on declaratory relief and will enter such judgment forthwith.